**BROWN & WILLIAMSON TOBACCO CORP., Plaintiff-Appellee,**

v.

**FIRST NATIONAL BANK OF BLUE ISLAND, a national banking association, Defendant-Appellant.**

**No. 73–1804.**

United States Court of Appeals, Seventh Circuit.

Heard May 29, 1974.

Decided Oct. 21, 1974.

---

Gerald F. Munitz, Gerald D. Skoning, Chicago, Ill., for defendant-appellant.

Watson B. Tucker, Kenneth M. Stern, Chicago, Ill., for plaintiff-appellee.

Before CLARK,* FAIRCHILD, and PELL, Circuit Judges.

CLARK, Associate Justice.

This appeal, involving Sections 9–205 and 9–306(2) of the Uniform Commercial Code,[1] arises from a judgment entered in favor of appellee, Brown and Williamson Tobacco Corporation (B & W), for $70,724 and against appellant, First National Bank of Blue Island (Blue Island). We outline the facts here.

F. W. Koenecke & Sons, Inc. (Koenecke, Inc.), a tobacco wholesaler, was

---

* Associate Justice Tom C. Clark, United States Supreme Court (Ret.) is sitting by designation.

1. Section 9–205 of the Uniform Commercial Code:

"A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral . . . or to collect or compromise accounts . . . or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral." Section 9–306(2) :

"Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor."

controlled by Robert Koenecke and his wife, Imogene. It bought tobacco products from various suppliers, including B & W, R. J. Reynolds Tobacco Corporation (RJR) and others. Its purchases from B & W were covered by a security agreement dated October 22, 1968, which, inter alia, assigned and granted to B & W a continuing security interest in all of Koenecke, Inc. current and future inventory of B & W products, accounts receivable arising from the sale of such products and all products and proceeds of the foregoing, all of which was referred to as "collateral". It further provided ". . . except for the sale of B & W cigarettes and other tobacco products in the ordinary course of business (Koenecke, Inc.) will not sell, assign or create or permit to exist any lien on or security interest in any collateral to or in favor of anyone other than B & W".

Koenecke, Inc. maintained a general checking account at Blue Island (No. 0–072–8) in which it deposited receipts from sales of tobacco products handled by it. Blue Island made loans both to Koenecke, Inc. and to Robert Koenecke and his wife personally. The first of these personal loans to the Koeneckes was on June 6, 1967, for $20,000 and paid on July 6, 1967, by Koenecke, Inc. On February 5, 1968, the Koeneckes borrowed $100,000 which was paid by Mr. Koenecke on April 9, 1968. On June 20, Koenecke, Inc. borrowed $82,000 which was paid by the company on September 17, 1968. On October 23, 1968, the Koeneckes borrowed $67,000 which was paid by the company on December 21, 1968. And on January 9, 1969, the Koeneckes borrowed $108,000, which was paid by the company on January 13, 1969. The proceeds of all of these loans were ultimately deposited in the bank account of Koenecke, Inc., No. 0–072–8.

Throughout the Fall of 1968 and continuing into 1969, Koenecke, Inc. suffered severe adverse publicity—especially through the press in Chicago—the gist of which was that its licensing arrangements were unlawful; its sales of cigarettes bore no Illinois revenue stamps; and some of its licenses were obtained through forgery. This had an adverse effect upon its sales.

On October 29, 1968, a $250,000 loan to Robert Koenecke and his wife was made by Blue Island on their personal, unsecured note. The proceeds of this loan were placed in the Koenecke, Inc. checking account No. 9–072–8, but the company did not sign, guarantee or endorse the same. The note was renewed on December 28, 1968 for 60 days. On February 10, 1969, Blue Island, becoming disturbed over Koenecke, Inc.'s finances, stopped honoring checks of Koenecke, Inc. that were drawn on uncollected funds deposited in checking account No. 0–072–8. Koenecke, Inc. was not notified of this action and, when it found out, it withheld making any further deposits in the account. At this time, there were several hundred thousand dollars in checks drawn against its general account, No. 0–072–8, which Koenecke, Inc. had issued to its suppliers, among whom were B & W and RJR. On February 17, 1969 representatives of RJR appeared in person at the bank, seeking collection of · several previously dishonored checks. On that day there was a balance in the Koenecke, Inc. checking account No. 0–072–8 of $713,586.52, of which $113,911 was attributable to sales by Koenecke, Inc. of B & W products which were covered by the security agreement.

On this same day—February 17th—the President and the Vice President of Blue Island spoke by telephone with Robert Koenecke and requested payment of the $250,000 note, although it was not due until February 26, 1969. Mr. Koenecke told Blue Island officers to pay the note from the corporate checking account of Koenecke, Inc., No. 0–072–8, and this was done by a debit memo of the bank on the next day. On February 18th he also directed Blue Island to debit Koenecke, Inc.'s account $40,000 and to issue a cashier's check in that amount to him. He endorsed the cashier's check to RJR.

On the 18th of February, upon the opening of Blue Island, there was a balance of $498,055.85 in the checking account No. 0–072–8 of Koenecke, Inc. and of this amount $70,724 was attributable to the proceeds of the sales of B & W products. Also on February 18th three representatives of B & W called personally on Blue Island to pay several checks drawn on Koenecke, Inc. account No. 0–072–8, but the bank refused because of a reported insufficiency of funds. During that same morning, representatives of RJR conferred with Blue Island officials and Robert Koenecke at the bank's offices in an attempt to collect an additional sum of several hundred thousand dollars for recent sales of its products to Koenecke, Inc. During a coffee break within the RJR meeting, Blue Island officers procured the signature of Robert Koenecke to the debit memo authorizing the payment of the Koeneckes' $250,000 note, but B & W was not advised thereof, although its representatives were in the bank. At the end of that day the checking account of Koenecke, Inc., No. 0–072–8 had a balance of only $3,317.49.

Koenecke, Inc. closed operations on February 24, 1969 and on March 13th a petition was filed to adjudicate Koenecke, Inc. bankrupt. On April 28, 1969, at a hearing on the bankruptcy matter, Vice President Mansfield of Blue Island, with some evasion, testified that at the direction of Mr. Koenecke, he had taken $252,567.70 from checking account No. 0–072–8 of Koenecke, Inc. and paid off with interest the personal note of Robert Koenecke and his wife due Blue Island on February 26, 1969. B & W elected not to participate in the bankruptcy, having decided to stand on its security. The Trustee in bankruptcy of Koenecke, Inc. sued Blue Island for some $530,000 covering several transfers of cash from Koenecke, Inc. to the bank. That suit was settled on November 23, 1970, for $100,000.

The bank raises four issues: (1) Did B & W lose its security interest by permitting the proceeds from the sale of its products to be commingled with other funds in the corporate account of Koenecke, Inc.; (2) Did B & W "cover" or trace its proceeds into the hands of the bank either as to depository or the ultimate transferee; (3) Did an action for conversion lie; (4) Was the transfer of the $252,567.70 to Blue Island from the account of Koenecke, Inc. a fraudulent one.

■ We decide the first two questions against the bank and affirm. The bank admits that "it sought and obtained preferred treatment for the payment of its $250,000 loan" but insists that its action constituted neither a conversion of B & W property nor a fraudulent transfer thereof. We find it unnecessary to pass on these issues since B & W had a perfected security interest in its "collateral" which was deposited in the Koenecke, Inc. checking account No. 0–072–8 and which it traced to the bank.[2]

I. *B & W did not lose its security interest:*

■ Blue Island relies primarily upon the argument that B & W gave up its ability to identify its collateral when it permitted Koenecke, Inc. to commingle that collateral with other funds deposited in the latter's account No. 0–072–8. We find both the Uniform Commercial Code and the decided cases to the contrary. Section 9–205 of the Code specifically provides: "a security interest is not invalid . . . by reason of liber-

2. Blue Island additionally argues that the judgment order of the trial court is defective because it failed to make findings of fact and conclusions of law as required by Fed. R.Civ.P. 52. The facts were stipulated and are included in the record and the Memorandum Opinion of the trial judge dated October 26, 1972 and the Judgment Order of July 18, 1973 set out the conclusions of law. It would have been supererogatory to again set them out under new tags. Further, Blue Island never raised the point until it filed its brief here. If it believed Rule 52 was violated and its appeal disadvantaged thereby, it should have given the trial judge an opportunity to correct the omission.

ty in the debtor to use, commingle, or dispose of all or part of the collateral . . . or . . . of proceeds." And Section 9–306(2) adds: The security "also continues in any identifiable proceeds including collections received by the debtor."

Thus the Code "is explicit in preserving the priority of the secured party to the proceeds notwithstanding his consent to the sale of the primary collateral and further notwithstanding his consent to the debtor's unrestricted use and disposition of these proceeds so long as they remain identifiable." In re Mid State Wood Products Company, 323 F.Supp. 853, 857 (N.D.Ill.1971).

Blue Island urges us to follow a statement by Professor Grant Gilmore that proceeds cease to be identifiable when deposited in a bank account, so that the security interest is lost when such commingling occurs. *See* 2 G. Gilmore, Security Interests in Personal Property. § 27.4, at 735–36 (1965). Since Professor Gilmore was the principal draftsman and Reporter for Article 9 of the Code, his interpretation, though subsequently voiced, commands attention. Nevertheless, examining the language of the Code, in the light of its purpose, we conclude that the more reasonable implication is that the proceeds may be identifiable, and the security interest therein survive, even though commingled.

In Grain Merchants of Indiana v. Union Bank and Savings Co., 408 F.2d 209 (7th Cir. 1969) this court observed:

[M]any lenders making loans secured by a revolving pool of collateral have dispensed with the assignment of individual receivables and the use of special cash collateral accounts for receiving and disbursing the proceeds therefrom. This flexible method of financing, with its minimum cost, is authorized by Section 9–205 of the Code, which abrogates the state law 'debtor dominion' rule of Benedict v. Ratner [268 U.S. 353, (45 S.Ct. 566, 69 L.Ed. 991) (1925)] and would be jeopardized if financing institutions had to insist on individual assignment of after-arising accounts receivable. [408 F.2d at 216.]

Universal C.I.T. Credit Corp. v. Farmers Bank of Portageville, 358 F.Supp. 317 (E.D.Mo.1973), upheld a security interest in cash from the sale of automobiles which had been deposited in the automobile dealer's general bank account. The court held that "proceeds are 'identifiable' if they can be traced in accordance with the state law. . . . The mere fact that the proceeds from the sales of the six automobiles were commingled with other funds . . . does not render the proceeds unidentifiable. . . ." 358 F.Supp. at 323–324. *See also* Associates Discount Corp. v. Fidelity Union Trust Co., 111 N.J.Super. 353, 268 A.2d 330 (1970); Girard Trust Corn Exchange Bank v. Lepley Ford, Inc., 25 Pa.D. & C.2d 395 (Pa.Ct. Comm.P.1958). In Howarth v. Universal C.I.T. Credit Corporation, 203 F. Supp. 279, 282 (W.D.Pa.1962), the court at least assumed that if proceeds of collateral could be traced into a bank account, such proceeds would be deemed identifiable, and subject to the security interest. We are not persuaded by the contrary authority of Morrison Steel Co. v. Gurtman, 113 N.J.Super. 474, 274 A. 2d 306 (1971).

■■ Looking to Illinois law, it is clear in the different, but probably analogous, case of a fund impressed with a trust, such fund may be traced into a fund of commingled money, People v. Bates, 351 Ill. 439, 184 N.E. 597, 598 (1933), and it is conclusively presumed in equity that a trustee dissipates or spends his own funds first, before encroaching upon a trust fund. People v. People's Bank and Trust of Rockford, 353 Ill. 479, 187 N.E. 522, 525 (1933).

II. *B & W traced its collateral to Blue Island:*

■ But Blue Island says that B & W did not trace or "cover" collateral into the hands of the bank. However a reading of the agreed stipulation of facts and of paragraph 3 of B & W's

complaint [3] which Blue Island admits to be true, shows the contrary.

There is no difficulty in tracing $70,724 of proceeds in which B & W had a security interest into the money in the checking account February 18, 1969. Blue Island has stipulated that Koenecke, Inc.'s checking account No. 0–072–8 had $498,055.85 in it on February 18 and that $70,724 thereof represented proceeds of sales of B & W products covered by the security agreement, calculated "through the application of generally accepted auditing and accounting principles."

Blue Island has stipulated further on that same day it transferred to itself, out of that same account, $252,567.70 in payment of Robert and Imogene Koenecke's personal note, not yet due. There were other transfers during the day amounting to $247,170.66 and at the close of business the balance was $3,317.49. The bank contends that the $70,724 has not been sufficiently identified as part of the $252,567.70 the bank transferred to itself, and it therefore must not be deemed to have had constructive notice of B & W's security interest therein.

Whether rationalized in terms of identifiability or of fairness in holding the bank to constructive notice, we think that the matter turns upon whether the transfer to Blue Island was a transfer in the ordinary course of business. Official Comment 2(c) to § 9–306 of the Code says as follows:

Where cash proceeds are covered into the debtor's checking account and *paid out in the operation of the debtor's business,* recipients of the funds of course take free of any claim which the secured party may have in them as proceeds. What has been said relates to payments and transfers in ordinary course. The law of fraudulent conveyances would not doubt in appropriate cases support recovery of proceeds by a secured party from a transferee out of ordinary course or otherwise in collusion with the debtor to defraud the secured party. [Uniform Commercial Code Comment to Smith-Hurd Ill.Rev.Stat. ch. 26 § 9–306, p. 403 (emphasis added).]

Examination of the circumstances of the transfer persuades us that the transfer was clearly outside the ordinary course of business. At the beginning of the day, representatives of B & W appeared at the bank and sought the honoring of checks drawn to B & W on the Koenecke account, payment having been previously refused. Blue Island represented that the account did not contain adequate funds. Bank officers also met with RJR, also seeking payment for goods sold to Koenecke, Inc. During a coffee break in this meeting, Blue Island obtained a debit memorandum from Mr. Koenecke, authorizing the transfer to it. B & W representatives, still at the bank, were not informed.

There is no stipulation nor proof of the nature of the other transfers out of the account during the day nor the order in which they occurred. It seems likely, from the general situation, and we think fair to assume in the absence of proof, that they represented payment of checks

---

3. "Each such sale and delivery was made pursuant to, and was secured by a security agreement and financing statement executed by Koenecke on or about October 22, 1968 and duly filed on or about October 28, 1968. Copies of said security agreement and financing statement are attached hereto as Exhibits A and B and are expressly made a part hereof. By virtue of said agreement, as consideration for all current and future sales and deliveries of merchandise by B & W acquired a security interest in (among other things) all proceeds of Koenecke's B & W inventory and all proceeds of that part of Koenecke's accounts receivable attributable to its sale of B & W products ("B & W accounts receivable"). By virtue of the foregoing, Blue Island Bank knew, or was chargeable with knowledge of, B & W's security interest in the proceeds of Koenecke's B & W inventory and the proceeds of Koenecke's B & W accounts receivable."

which had been issued in the ordinary course of the business of Koenecke, Inc.

■ Therefore, we conclude that the funds subject to the B & W security interest were identifiable and the security interest continued in the money transferred to Blue Island. It seems fair and equitable to charge a party receiving a transfer from a general bank account outside the ordinary course of business with constructive notice of a security interest in funds therein.

A recent per curiam opinion by the Supreme Court, Mahon, Trustee, and CIT Corp. v. Stowers, 416 U.S. 100, 94 S.Ct. 1626, 40 L.Ed.2d 79 (1974), has come to out attention. It construed the Packers and Stockyard Act, certain regulations of the Secretary of Agriculture, and the Texas Business and Commercial Code. The CIT had a duly perfected security interest in all livestock, animal carcasses, packaged and unpackaged meat and other inventory of Samuels, a large meat packing concern. Stowers had sold some steers to Samuels and had a security interest in those animals and the proceeds therefrom. He had failed to perfect his security interest and was unable to establish his right to possession or ownership by identifying the property sought to be reclaimed in either its original or substituted form. The case is therefore inapposite here where the collateral of B & W has been traced to Blue Island. Nor is Fitzpatrick v. Philco Finance Corp., 7 Cir., 491 F.2d 1288 (1974) in point. The case involves the limitations of Ill.Rev.Stat. ch. 26, § 9–306(4) as to payments by the debtor to a secured creditor within ten days prior to bankruptcy. There is no comparable factual situation here.

We affirm the judgment.[4]

It is so ordered.

4. Blue Island in the alternative urges that a pro-rata application of the transfers of February 18, 1969, be made and B & W's judgment be reduced to $35,864.61. As we have said, B & W had a valid and enforceable security interest in the proceeds of the sales

of its products by Koenecke, Inc.; Blue Island prevented it from enjoying them and must pay the price for its action. Otherwise we would be placing the roses around the wrong horse.