In the Matter of Paul
CULLEN, Debtor.

**STATE NATIONAL BANK OF
PLATTEVILLE, Plaintiff,**

v.

**Paul CULLEN, Defendant.**

**Adv. No. 85–0174–7.**

United States Bankruptcy Court,
W.D. Wisconsin.

Feb. 9, 1987.

C. Scott Pryor, Howard, Peterman, Eisenberg, Solochek & Nashban, S.C., Milwaukee, Wis., for plaintiff.

Tim R. Valentyn, Murphy & Desmond, S.C., Madison, Wis., for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

This adversary proceeding to determine dischargeability was ably tried to the court on December 4, 1985. The plaintiff State National Bank of Platteville appeared by its attorneys Howard, Peterman, Eisenberg, Solocheck & Nashban, S.C., by C. Scott Pryor; the defendant Paul Cullen appeared by his attorneys Murphy & Desmond, S.C., by Tim R. Valentyn. The central issue is whether the debtor's selling approximately 550 head of livestock in which the State National Bank of Platteville ("bank") had a security interest without paying the proceeds from those sales to the bank constituted a willful and malicious injury to the bank for which the bank has a claim that is not dischargeable in the debtor's bankruptcy. At the time the sales were made the debtor was acting as vice-president, secretary, a director and shareholder of Cullen Livestock Co., Inc. ("CLC") which was the owner of the cattle.

This court has jurisdiction over the proceeding pursuant to 28 U.S.C. §§ 1334(a), 157(a), 157(b)(1) and 11 U.S.C. § 523(a)(6). The following constitute my findings of fact and conclusions of law.

Paul Cullen ("Paul") had been a cattle broker and feeder in partnership with his father Patrick Cullen ("Patrick") prior to the incorporation of CLC in 1978. At all times relevant to this proceeding and until Paul filed for relief under chapter 7 in this bankruptcy case on March 8, 1985, Patrick served as president of CLC and Paul served as vice-president and secretary. CLC conducted business both as a cattle dealer, when it would purchase cattle for prompt sale or fill orders for prospective purchasers of cattle, and as a cattle feeder, when it would retain cattle for 50 to 200 days during which time the cattle would be prepared for market either as beef or as bred heifers. Patrick had principal responsibility for purchasing cattle and Paul took principal responsibility for obtaining orders and carrying out sales. Both were active in the day-to-day management of CLC. In addition, CLC actively traded in the commodities futures market and both officers took an active role in that trading.

To finance its operations CLC borrowed from the bank and the bank's wholly-owned subsidiary Farmers Credit Corporation ("FCC"), a lender in the Farm Credit System. A large variety of long (one year or more) and shorter term loans were negotiated between CLC and the bank between 1978 and December 31, 1984. On September 27, 1984, loans due to FCC from CLC having a balance of approximately $581,078.91 were assigned by FCC to the bank. As of December 4, 1985, the total principal

balance due to the bank from CLC on notes from CLC, both direct and assigned, was $563,528.68. In addition accrued interest was due on that principal balance.

CLC's obligations to both the bank and FCC were secured. The bank had a general business security interest in property of CLC and also had a security interest in farm equipment, livestock, accounts and contract rights, livestock feed, farm supplies and some crops by virtue of a security agreement dated February 10, 1978, signed on behalf of CLC by Patrick, Paul and Geneva Cullen as treasurer of CLC. FCC held a security interest in farm equipment, livestock, accounts and contract rights, livestock feed and farm supplies pursuant to farm security agreements with CLC dated September 29, 1980, January 27, 1983, and July 18, 1983, signed by Patrick as president and Paul as vice-president, secretary of CLC. Each of the four security agreements provided in pertinent part:

(a) FARM PRODUCT SALES. If the Collateral includes any of the following types of farm products:

\*      \*      \*      \*      \*      \*

(3) Other Farm Products. Debtor may sell, lease, or otherwise dispose of the following farm products on terms and in a manner which are commercially reasonable: crops and livestock provided that all proceeds be submitted to the State National Bank of Platteville [to Farmers Credit Corporation of Platteville] in accordance with section 4(c) of the security agreement

\*      \*      \*      \*      \*      \*

(c) DEPOSIT WITH SECURED PARTY. At any time Secured Party may require that all proceeds of Collateral received by Debtor shall be held by Debtor upon an express trust for Secured Party, shall not be commingled with any other funds or property of Debtor and shall be turned over to Secured Party in precisely the form received (but indorsed by Debtor, if necessary for collection) not later than the business day following the date of receipt. All proceeds of Collateral received by Secured Party directly or from Debtor shall be applied against the Obligations in such order and at such times as Secured Party shall determine.

In addition, default of the security agreements was defined to include

(g) Default. Upon the occurence of one or more of the following events of default:

(1) Nonperformance. Debtor fails to pay when due any of the Obligations, or to perform, or rectify breach of, any warranty or other undertaking by Debtor in this Agreement or in any evidence of or document relating to the Obligations.

From 1978 until mid 1984 CLC had received gross receipts from sales in excess of one million dollars annually. During this time CLC's only bank account was a business checking account at the bank ("the bank account").[1] When CLC received sale proceeds it deposited the purchasers' checks in the bank account. As it incurred expenses, including those for the purchase of cattle, CLC drew checks on the bank account. CLC had for several years maintained a line of credit in the amount of $100,000.00 set up as a "confidential reserve account" to cover overdrafts in the bank account. The confidential reserve was set up to afford CLC greater flexibility in the purchasing of large lots of cattle. It was terminated by the bank in November, 1984.

The bank believes that from 1978 through the summer of 1983 all sale proceeds from CLC's inventory of cattle were deposited in the bank account. Payments on loans to the bank or FCC were made by checks drawn on the bank account. At least occasionally Patrick would bring a check from a purchaser of a lot of "feeder" cattle to the bank, display the check to an officer of the bank and express an intention to pay off a loan incurred in connection with the purchase of that lot of cattle. The check would then be deposited to the bank account and a check would be drawn on the bank account to pay off the balance due on the note in question. On other occasions when the balance in the bank account warranted, an officer of CLC would draw a

1. There was a separate "farm account" in the corporate name not relevant to this proceeding.

check for payment against a loan at FCC or the bank. In either case, the payment would be unsolicited by the bank's personnel and only in the former transactions would the payment correspond with the sale of a particular lot of cattle.

In the fall of 1983 the bank's executive vice-president Robert Olson who was in charge of the CLC loans became aware that proceeds from some sales of cattle had not been applied to outstanding loans. However, at that time Olson believed that the inventories of cattle held by CLC provided adequate collateral for the new and renewed loans written in the fall of 1983. In March of 1984 Olson again noted that proceeds from the sale of "feeder" cattle had not been applied to loans at the bank. Through June of 1984 payments continued to be made by CLC on loans due to the bank and FCC but in the opinion of Olson those payments were less than the total proceeds received for the sale of "feeder" cattle by CLC.

During May of 1984 CLC purchased approximately 550 head of primarily holstein heifers with the intention of holding them on pasture for sale later in the year. Most of these "feeder" cattle were pastured on approximately 1,200 contiguous acres known as the "Little Grant" pasture near Lancaster. It is not clear from the evidence that a new note was given to the bank or FCC for the purchase of the 550 heifers.

At a meeting on August 14, 1984, Robert Olson discussed with Paul the failure of CLC to pay over the proceeds of all sales of feeder cattle inventory to the bank. At that meeting Paul indicated that CLC had an inventory of approximately $687,430.00 worth of cattle, approximately equal to the balance due to the bank and FCC, consisting of 250 beef heifers on the Digman farm, 550 holstein bred heifers primarily on the Little Grant pasture with some at the Alton Keyes farm and some at the Cal Suthers farm, 66 beef heifers in Nebraska and 160 holstein steers in Hereford, Texas. Olson requested and Paul agreed that payment from the sales of that inventory would be made to the bank. Paul indicated

that the 250 beef heifers at Digman's had in fact been marketed already and that proceeds would be deposited. He also stated that as to the 550 bred holstein heifers efforts would be commenced within two weeks to sell 400 to 425 head by the end of 1984 and that the remainder would be sold in early 1985 prior to March.

On or about October 1, 1984, principal notes between the bank or FCC and CLC were extended to February 1, 1985. On October 30, 1984, proceeds of the sales of cattle from the Digman farm had still not been paid over to the bank. Olson accompanied by the bank's attorney Patrick Clare, who had been present at the August 14 meeting as well, met with Patrick and Paul to discuss among other matters the payment of future proceeds from cattle sales to the bank. Paul indicated arrangements were made to sell cattle in Mexico. Paul also stated that all the cattle identified at the August 14, 1984 meeting were still on hand, except those sold off the Digman farm, and that sales were to be completed by year end. Attorney Clare inquired as to the ownership of cattle. Both Paul and Patrick indicated that CLC owned all of the bred holstein heifers on the Little Grant pasture, with no suggestion of Paul's later contention that those cattle were owned in partnership with a Richard Coufal. No written memorandum of either the August 14, 1984, meeting nor the October 30, 1984, meeting was ever made.

On or immediately prior to November 6, 1984, the bank conducted its first and only inspection of collateral held for the CLC loans. That inspection consisted of a cattle count on the Little Grant pasture, Paul's home farm and other lands. One-hundred twenty open heifers of approximately 700 pound weight and 285 bred heifers weighing 1,000 to 1,150 pounds were found. The cattle were valued by the inspector Michael C. Weigel and a loan officer at the bank as $400.00 per open heifer and $875.00 per bred heifer for a total value of $297,375.00. Weigel noted that the heifers were in excellent condition. In notes to his inspection report Weigel indicated that

Cattle were in 1200 acres of continuous rolling pasture and timber. Cattle were verified by driving through accessible pasture with 4–wheel drive truck. Cullen Livestock maintains there are 500 hd. in pasture. Considering the type of terrain it would be very easy to not see 100–150 hd. on a given day. Pastures were getting short and cattle were moving into the timber.

On examination Weigel indicated that there was little possibility of counting any cow more than once and that he was confident that there were no fewer than the 405 total cows counted.

On November 2, 1984, Paul opened a checking account for CLC at the Mound City Bank in Belmont, Wisconsin, with a $50,000.00 deposit. That account remained opened until January 21, 1985, when it was closed out with a zero balance. During the three months in which the Mound City Bank account was open deposits to that account from the sale of CLC cattle were made in the following amounts:

| DATE | AMOUNT | PURCHASER |
|------|--------|-----------|
| 11/20 | $35,000.00 | Peterson |
| 12/05 | 50,000.00 | Ron White Livestock Inc. |
| 12/06 | 51,000.00 | Terry Peterson |
| 01/08 | 45,560.00 | Terry Peterson |

During the same period of time checks totalling approximately $420,000.00 were drawn on the account, most of which were payable to Paine Weber for commodities future trading by CLC. Paul supervised the deposits to and signed the checks drawn on the Mound City Bank account.

Paul released and/or delivered to Richard Coufal 160 head of bred heifers from the Little Grant pasture during November or December of 1984. Coufal had neither bills of sale indicating title to nor a security interest in the cattle transferred to him by CLC.

The bank received no proceeds from the sales of any of the cattle on Little Grant pasture after November 6, 1984.

■ The bank contends that Paul's failure to remit the proceeds from the sale of 550 head of livestock to the bank as con-

templated in the security agreement resulted in a willful and malicious injury to the bank's property within the meaning of 11 U.S.C. § 523(a)(6), which states:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

This court has held that injury under this section includes common law conversion. *In re Chambers*, 23 B.R. 206, 210 (Bankr. W.D.Wis.1982); *In re Donny*, 19 B.R. 354, 357 (Bankr.W.D.Wis.1982). To establish a claim for nondischargeability under section 523(a)(6), the bank must prove 1) an injury to the bank; 2) Paul's actions which brought about the injury; 3) the injury was intentional and malicious; and 4) the injury gave rise to a claim for damages in favor of the bank.

## I.

The bank argues that under the terms of the security agreement, CLC had a duty to submit the proceeds from the sale of the 550 head of cattle to the bank.[2] Since Paul failed to submit the sale proceeds the bank maintains that he is guilty of common law conversion. The Supreme Court of Wisconsin has defined conversion as

> any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein, such as a tortious taking of another's chattels, or any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of the possession, permanently or for an indefinite time.

*Heuer v. Wiese*, 265 Wis. 6, 8, 60 N.W.2d 385 (1953), quoting *Adams v. Maxcy*, 214 Wis. 240, 245, 252 N.W. 598 (1934). In order to establish a claim for conversion, the plaintiff must prove that at the time of the alleged conversion, he was entitled to immediate possession of the converted property. *Production Credit Association*

2. The bank bases this argument on sections 7(a), 4(a) and 4(c) of the security agreement.

*of Chippewa Falls v. Equity Coop Livestock Sales Association,* 82 Wis.2d 5, 10, 261 N.W.2d 127 (1978).

Had the bank based its conversion claim on Paul's sale of the cattle, rather than on his failure to remit sale proceeds, it is clear that the bank would not prevail.[3] In a recently decided case, the Court of Appeals of Wisconsin considered the effect of a creditor's condition requiring subsequent payment sale of the debtor's collateral and found it to be ineffective in preserving the creditor's right to pursue a purchaser for conversion.[4] *Production Credit Association of Baraboo v. The Pillsbury Company,* 132 Wis.2d 243, 392 N.W.2d 445 (1986).

■ A condition will be ineffective unless the buyer can control performance of the condition. *Id.* at 249, 392 N.W.2d 445, citing *First National Bank v. Iowa Beef Processors,* 626 F.2d 764, 769 (10th Cir. 1980). Because conditioning the authorization of sale on the debtor's remittance of proceeds places control of the performance of the condition on the debtor, and not the buyer, the condition is ineffective. *PCA v. Pillsbury,* 132 Wis.2d at 249, 392 N.W.2d 445. The bank gave Paul authorization to sell these cattle as long as he remitted the sale proceeds to the bank. Like PCA in *Pillsbury,* the bank lost its security interest in the cattle when Paul sold them. Once the security interest is extinguished, the creditor no longer has a property interest in the collateral, and thus could not maintain a conversion action based on the sale itself.

## II.

The *Pillsbury* court did not have to address the issue of whether a creditor who authorizes the sale of collateral still retains a security interest in proceeds pursuant to WIS.STAT. § 409.306(2).[5] The Supreme Court of Wisconsin has stated that "... sec. 409.306 clearly contemplates that a properly perfected security interest in collateral continues in the proceeds of that collateral, including collections ..." *Commercial Discount Corporation v. Milwaukee Western Bank,* 61 Wis.2d 671, 683, 214 N.W.2d 33 (1974). But no Wisconsin court has ruled on this issue directly.

■ Very few courts have addressed the issue of whether the security interest in proceeds survives the authorized sale of collateral. One bankruptcy court, in considering its state statute, which is comparable to WIS.STAT. § 409.306(2), concluded that when a creditor authorizes the debtor to sell its collateral it also defeats its security interest in the proceeds derived from the sale. *In re Quaal,* 40 B.R. 619, 621 (Bankr.D.Minn.1984). But more courts and the better reasoned opinions have concluded that a security interest in proceeds continues in accordance with the express language of U.C.C. § 9–306(2) regardless of a secured party's consent to sale of the collateral. *In re Turner,* 13 B.R. 15, 22 (Bankr.D.Neb.1981); *In re Hollie,* 42 B.R. 111, 120 (Bankr.M.D.Ga.1984); *In re Kittyhawk Television Corporation,* 383 F.Supp. 691, 694 (S.D.Ohio 1974); *Brown & Williamson Tobacco Corp. v. First National Bank of Blue Island,* 504 F.2d 998, 1001–02 (7th Cir.1974).

In *In re Hollie* the court concluded that the effect of consent to sell milk is that the security interest in the milk itself was waived, but the security interest continues in identifiable proceeds of milk sales. 42

---

**3.** Neither party disputes the fact that the security agreement gave CLC express written authorization to sell its cattle.

**4.** WIS.STAT. § 409.306(2) provides:
Except where this chapter otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

**5.** The pertinent part of WIS.STAT. § 409.306(2) reads that the security interest "also continues in any identifiable proceeds including collections received by the debtor."

It is unnecessary for a court in a conversion action against the third party purchaser to consider whether the creditor retains a security interest in proceeds because it would be the debtor, not the third party, who converts the proceeds.

**280**

B.R. at 120. In *Brown & Williamson Tobacco Corp.* the court adopted the conclusion of an Illinois District Court that section 9–306(2) reserves the right to proceeds notwithstanding authorization to sell the primary collateral. 504 F.2d at 1002, citing *In re Mid State Wood Products Company,* 323 F.Supp. 853, 857 (N.D.Ill.1971). Professor Gilmore, principal draftsman for Article 9 of the Uniform Commercial Code, endorses this interpretation:

> Subsection (2) takes up what happens when a debtor disposes of collateral. If the secured party did not authorize the disposition, his interest in the collateral continues to be good against the purchaser unless it is cut off by the rules of negotiability or good faith purchase. If the secured party authorized the disposition, the purchaser takes free of the security interest. Whether the disposition was authorized or unauthorized, the security interest 'continues in any identifiable proceeds received by the debtor.'

2 Gilmore, *Security Interests in Personal Property,* § 45.9, at 1336 (1965).

The debtor's brief does not address the issue of whether the bank's security interest in the proceeds survived the sale of the cattle under section 409.306(2), but rather argues that the bank was not entitled to immediate possession of the proceeds at the time of the sale in November of 1984. He claims that paragraph 4 of the security agreement which provides:

> At any time Secured Party may require that all proceeds of Collateral received by Debtor shall be held by Debtor upon an express trust for Secured Party, shall not be commingled with any other funds or property of Debtor and shall be turned over to Secured Party in precisely the form received ... not later than the business day following the date of receipt. All proceeds of Collateral received by Secured Party directly or from Debtor shall be applied against the Obligations in such order and at such times as Secured Party shall determine.

means only that the bank had the right by giving notice to require that the debtor turn over the sale proceeds. Rather than request the proceeds, the debtor contends that through its course of dealing with CLC and the debtor, the bank authorized the regular sale of cattle and the debtor's retention of the proceeds.

■ While it may be true that the bank did not give notice of its demand at any earlier date, on August 14, 1984, the bank requested, through Mr. Olson, that Paul turn over the proceeds from the sale of the 550 holstein bred heifers to the bank. This oral request was sufficient to invoke the bank's requirement that CLC turn over the proceeds immediately upon the sale of the cattle. Paul assured the bank that he would be selling the cattle in the near future and agreed that he would turn over the proceeds immediately upon the sale of the cattle. From the moment of that agreement the bank had the right to immediate possession of the proceeds upon the sale of the cattle. The right to immediate possession was not jeopardized by the authorized sale of the cattle because the bank retained its security interest in the proceeds.

■ In order for the creditor's security interest in proceeds to continue under section 409.306(2) the creditor must also establish that the proceeds are identifiable. In this case the proceeds are identifiable because Paul deposited them in a separate bank account at Mound City Bank. Only checks from the sale of cattle were deposited in the Mound City account. Thus, the bank's security interest in the proceeds could certainly be traced into this separate bank account.

Paul claims that if the court finds that the proceeds were converted, it must find that the corporation converted the proceeds, not Paul himself. In support of this argument he raises two major points. First, he claims that he was not involved with nor responsible for the financial affairs of the corporation. Secondly, he claims that it was the corporation's duty, not his individual duty, to submit the proceeds to the bank, and if the bank is unable to show that he actively participated in the disbursement of proceeds, its claim must fail.

While it may be technically true that it was the corporation's duty, not his duty to submit the proceeds, this argument ignores the fact that a corporation is a legal entity which is able to act only through its agents. Despite Paul's attempt to show that he was not involved in the corporation's financial matters, the evidence shows that at least as to these transactions, he did actively participate in the financial affairs of the corporation. Because it was Paul as an individual, not the corporation as an entity, that opened the Mound City Bank account and concealed the proceeds, Paul was responsible for the conversion not CLC.

Paul further contends that the outstanding loans for which the bank seeks repayment are debts of CLC, not Paul personally, therefore these debts cannot be declared nondischargeable in his individual bankruptcy. He posits that in order for the bank to establish a section 523(a)(6) claim against him, the bank must establish that Paul, not CLC, owes an underlying debt to the bank. It is true that officers and directors of a corporation are generally not liable for the debts of the corporation merely because they are officers or directors or are engaged in the active management of the corporation. *In re Penning*, 22 B.R. 616, 618 (Bankr.E.D.Mich.1982). However, "[a] corporate agent cannot shield himself from personal liability for a tort he personally commits or participates in by hiding behind the corporation entity ..." *Oxmans' Erwin Meat Co. v. Blacketer*, 86 Wis.2d 683, 692, 273 N.W.2d 285 (1979). In the bankruptcy case of *In re Penning*, the court was presented with the issue of "whether a debtor, by conduct as an officer of a corporation, may incur liability to a creditor of the corporation which is nondischargeable in his individual bankruptcy proceeding." 22 B.R. at 618. The debtor sold collateral belonging to the corporation without accounting for the proceeds of the sale. In addressing the issue at hand, the court recited a "general rule"

> that if an officer or agent of a corporation directs or participates actively in the commission of a tortious act or an act from which a tort necessarily follows or

may reasonably be expected to follow, he is personally liable to a third person for injuries proximately resulting therefrom.

> ... The debt so created is nondischargeable in the officer's or director's personal bankruptcy (citation omitted).

*Id.* at 619. The court concluded that because Penning actively participated in the conversion, the debt was nondischargeable in his personal bankruptcy pursuant to section 523(a)(6):

> Campers Corral [the debtor's corporation], by disposing of the snowmobiles without accounting for the proceeds of sale, in express violation of its security agreement with Bombardier, was guilty of a willful and malicious conversion of Bombardier's [the creditor] property. (citations omitted). The debtor actively participated in this conversion. He made the decision to dispose of the snowmobiles and the decision not to turn over the funds derived from their disposition to Bombardier. It follows, therefore, that this debt is non-dischargeable by virtue of section 523(a)(6).

*Id.*

As in the *Penning* case, it was Paul's decision not to turn over the funds from the sale of the collateral. He was the one who committed the tort, therefore it is he, and not the corporation, who is liable to the bank for the injuries proximately resulting therefrom.

Having found that Paul individually has converted the bank's proceeds and that this conversion has injured the bank, it is necessary to determine whether this injury is malicious and willful within the meaning of section 523(a)(6). To meet the requirements of section 523(a)(6) it is necessary that the injury be both willful and malicious. *In re Scotella*, 18 B.R. 975, 977 (N.D.Ill.1982). Willful has been interpreted to mean deliberate or intentional. *In re Ries*, 22 B.R. 343, 346 (Bankr.W.D.Wis. 1982); *In re Chambers*, 23 B.R. 206, 210 (Bankr.W.D.Wis.1982). There is no question that Paul deliberately and intentionally deposited the proceeds of the sale of cattle into a separate checking account at the

Mound City Bank in Belmont, Wisconsin and used the proceeds to pay Paine Weber for commodities future trading. The real question is whether this willful failure to remit proceeds was malicious.

 For a debtor's acts to be malicious, all that is required is that the debtor know that his act will harm another and proceed in the face of that knowledge. *In re Ries*, 22 B.R. at 347. Under this standard there must be actual knowledge; a finding that the debtor should have known that harm would result will not suffice. *Id.* The debtor's knowledge may be inferred from his experience in business, his concealment of the sale, or his admission that he read the security agreement which forbade the sale of the collateral. *Id.*

Paul claims that he was not in charge of nor accustomed to handling the proceeds of sales. Regardless of whether this is true, Paul did handle these proceeds. He is an experienced cattle broker. He has been in the business for over eight years. He signed the security agreement and it is doubtful that this is the first security agreement he has had to sign. Whether he read the agreement or not, he was told several times by bank representatives that CLC had an obligation to turn over to the bank the proceeds from cattle sales. He promised the bank that CLC would be selling the cattle within a few months and that the bank would receive the proceeds immediately upon the sale of the cattle. He knew the nature of CLC's obligation to the bank, but did not turn over the proceeds. The court can infer, from Paul's concealment of the sale and concealment of the proceeds in a new bank account, that Paul knew the bank would be harmed by his conversion of the bank's proceeds. *See In re Ries*, 22 B.R. at 347. Paul's actions constituted a willful and malicious injury to the property of another entity within the purview of section 523(a)(6).

Upon the foregoing, judgment may be ordered in favor of the bank and against Paul determining that he is liable to the bank in the amount of the bank's claim and that liability is not dischargeable.