In re Nye C. **PELTON**, Debtor.

**Bankruptcy No. 92–31790–7.**

United States Bankruptcy Court,
W.D. Wisconsin.

Aug. 16, 1994.

Marc R. Soderbloom, Quale, Hartmann, Bohl, Stevens & Reynolds, S.C., Baraboo, WI, for Farm Credit Services.

Michael E. Kepler, Trustee, Kepler & Peyton, Madison, WI.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Nye C. Pelton ("Pelton"), filed for protection under chapter 13 of the Bankruptcy Code. His case was converted to chapter 7 on September 8, 1992. One of his scheduled assets, a receivable from Anderson Livestock ("Anderson"), is the subject of this dispute between Farm Credit ("FC") and Pelton's bankruptcy trustee.

Pursuant to an agreement, Pelton selected cattle which were purchased with Anderson's money. The cattle were shipped to Pelton's farm in Wisconsin where he fed and cared for them. When the animals reached a certain weight, they were then sent to Anderson's farm in Nebraska for finishing. Pelton then advised Anderson of his expenses for feed, transportation, medical care and yardage. After the cattle were sold, Anderson paid Pelton the proportion of the sales price which Pelton's expenses bore to the total cost of purchasing and raising the cattle. At the time he filed bankruptcy, Pelton was awaiting payments on two lots of cattle.

The trustee collected three separate payments totaling $18,201.79 from Anderson. No more is due. The payments have been prorated to reflect the following items:

Jerome M. Ott, Lawton & Cates, S.C., Madison, WI, for debtor.

| | |
|---|---|
| Feed | $12,220.91 |
| Transportation | $910.54 |
| Medical (Veterinary & Medication) | $2,301.84 |
| Yardage | $2,749.00 |

In November, 1992, this court determined that $2,062.00 of the receivable was exempt as wages.

FC held a properly perfected security interest in Pelton's crops, feed and their proceeds. Unknown to FC, and contrary to the security agreement[1], Pelton had fed the

1. Farm Credit authorized limited disposition of collateral in Section 3.2 of the security agreement:

Collateral Which May be Sold, Leased or Expended. Subject to any conditions stated in

Section 3.3 and 3.4 and to Creditor's continuing security interest in all proceeds and accounts arising from permitted disposition of Collateral. Debtor, before default, may in a commercially reasonable manner (a) market

Anderson cattle FC's collateral. FC filed a claim totaling $41,783.85. FC stated that $12,220.91 of that amount was secured by the Anderson receivable. At no time did Pelton own the animals fed the FC collateral, nor did FC hold any security interest in the Anderson cattle.

In support of its partially secured status, FC argues that the account receivable is identifiable proceeds from disposition (eating) of its collateral. In the alternative, FC argues that the account receivable is proceeds of goods sold to Anderson under a contract for future sale; the sale having taken place when the feed and crops were placed before the cattle for consumption. Finally, FC argues that if a joint venture was created as the trustee suggests, Pelton "exchanged" the collateral for an interest in the joint venture.

Under Wis.Stat. § 409.306(2) (1993), a security interest "continues in collateral notwithstanding sale, exchange or other disposition" of collateral. The security interest "continues in any identifiable proceeds including collections received by the debtor." § 409.306(2). If the receivable represents identifiable proceeds of FC's collateral, the security interest would continue in it. Wis. Stat. § 409.306(4)(a) (1993) or § 409.306(3)(a) (1993).

■ The feeding of one's own cattle is neither the lease nor sale of the feed. *See First National Bank of Brush v. Bostron,* 39 Colo.App. 107, 564 P.2d 964 (1977); *Farmers Cooperative Elevator Co. v. Union State Bank,* 409 N.W.2d 178 (Iowa 1987); *In re McDougall,* 60 B.R. 635 (Bankr.W.D.Pa. 1986). However, FC argues that the unauthorized consumption of the feed by Anderson's cattle constitutes "other disposition" of FC's collateral. Therefore, under FC's analysis, its security interest in the feed would continue in the cattle and their proceeds. Wis.Stat. § 409.306(2).

■ Courts have been uniform in concluding that feeding animals is not considered an

milk, (b) market eggs, (c) use feed and crops or products thereof a[sic] feed for Debtor's livestock and poultry, and (d) sell or lease any collateral listed here: (none listed).

"other disposition" of crops or feed under statutes identical to Wis.Stat. § 409.306(1) (1993). In *First National Bank of Brush v. Bostron,* 39 Colo.App. 107, 564 P.2d 964 (1977), a Colorado Court of Appeals construed Colorado's § 4–9–306, CRS 1973. In *Bostron,* a creditor held a security interest in "all feed now owned or hereafter acquired, all crops now growing or to be grown, proceeds and products of collateral." *Id.* 564 P.2d at 965. The creditor's collateral was fed to the debtor's cattle. The court found that the debtor "received nothing when he disposed of the collateral by feeding it to the cattle ... the collateral was consumed, and there are no traceable proceeds to which the security interest may be said to have attached." *Id.* 564 P.2d at 966. The court decided not to extend the creditor's security interest to the parts of the butchered animal because the extension would not follow the legislative intent of the Colorado General Assembly. The court held that the cattle which consumed the feed were not proceeds of the collateral under Colorado's § 4–9–306, CRS 1973.

In *Farmers Cooperative Elevator Co. v. Union State Bank,* 409 N.W.2d 178, 180 (Iowa 1987), the Iowa Supreme Court concluded that hogs were not proceeds of their feed. One secured creditor had an interest in the debtor's crops and another secured creditor had an interest in the debtor's hogs. Upon the debtor's default, the creditor with a security interest in the crops argued that the hogs were "proceeds" of the crops pursuant to § 554.9306(1) because the reference to "other disposition of collateral" found in the section included the ingestion of feed and other biological processes. The Iowa Supreme Court rejected the argument, holding that:

> Ingestion and biological transformation of feed is not a type of "other disposition" within the contemplation of section 554.-9306. For UCC purposes, the hogs are not proceeds of feed.

The authorization of feeding is limited to the debtor's own livestock.

In *In re McDougall*, 60 B.R. 635 (Bankr. W.D.Pa.1986), the debtor purchased cattle and fed the animals with the creditor's collateral. The animals were sold. The court decided "that a security interest in feed or grain does not continue into cattle which consume the feed or the proceeds of such cattle upon their sale." *Id.* at 636. Although the case dealt more with an interpretation of U.C.C. § 9–315, it is instructive because the ultimate holding is that an interest in crops does not continue into the proceeds of animals that eat crops. FC does not raise the argument under Wisconsin § 409.315 (identical to U.C.C. § 9–315) that the feed became commingled with the cattle. While these three cases differ from the debtor's circumstances, the resulting loss of the security interest can be no different simply because the animals the debtor fed were not the debtor's own.

■ FC suggests that it is not claiming the cattle as proceeds, but rather, because Anderson has sold the cattle, the cash proceeds can be split into portions including a portion for its collateral. This "phoenix" argument is meritless. For FC to argue that their security interest in feed would disappear when fed to the cattle, but reappear upon the sale of the cattle seeks a result that is outside the law. Once lost, the characterization of proceeds cannot be regained by the sale of the cow which consumed the feed.

■ FC next contends that the account receivable is the proceeds of goods sold to Anderson under a contract for future sale, thereby enabling its security interest to attach.[2] In order for the security interest to continue into the Anderson receivable, FC must show that there was a contract to sell.[3] A "contract" is "the total legal obligation

which results from the parties' agreement as affected by chs. 401 to 411 and any other applicable rules of law." Wis Stat § 401.-201(11) (1993). An "agreement" is defined in Wis.Stat. § 401.201(3) (1993) as:

> [T]he bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in chs. 401 to 411 (§§ 401.205 and 402.208). Whether an agreement has legal consequences is determined by chs. 401 to 411, if applicable: otherwise by the law of contracts (§ 401.-103).

■ I find that there was an agreement between the parties for the sale of crops and feed. Pelton's compensation was directly related to the amount of feed and crops given to the cattle. Under the agreement, Pelton was to indicate to Anderson the value of feed, crops, medical expenses incurred, etc. Because both parties understood the nature of how Pelton was to be compensated, both parties were aware that the agreement included the sale of crops and feed. Therefore, the requirements of § 401.201(3), are satisfied.

■ The parties intended to make a contract, even though there was no specific price term in the agreement. The price was to be calculated upon the current market value of the feed in the proportion which that expense bore among other defined expenses to the sale price of the cattle. The contract for the sale of crops and feed would not fail for indefiniteness. There was an intent to contract and a reasonably certain basis for giving an appropriate remedy.[4] Wis.Stats. § 402.204(3) (1993)[5]; § 402.305 (1993)[6]; *see*

---

2. Farm Credit argues that the sale occurred between the debtor and Anderson when the debtor designated the feed fed to the cattle. The title to goods under a contract for sale passes when the seller delivers the goods. Wis.Stat. § 402.401(2).

3. A contract to sell apart from the land of growing crops is a contract for the sale of goods within Chapter 402. Wis.Stat. § 402.107(2).

4. *See* James J. White & Robert S. Summers, *Uniform Commercial Code,* § 3–7 (1988).

5. Wisconsin Statute § 402.204 provides:

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.

6. Section 402.305 provides:

(1) The parties if they so intend can conclude a contract for sale even though the price is not

also Ginsu Products, Inc. v. Dart Industries, Inc., 786 F.2d 260, 265 (7th Cir.1986) (holding that in order for a contract to exist with missing term there must first be an intent to contract by both parties). Courts have held that "price" may be determined in reference to a party's cost. See Bernina Distributors, Inc. v. Bernina Sewing Machine Co., 646 F.2d 434, 440 (10th Cir.1981) (providing that pursuant to provision of contract between importer and distributor, the price of merchandise sold would be the cost of prior machines plus any increase in price of a new model imposed by the factory, plus ten percent of said increase).

■■■ Because the sale of the crops and feed exceed $500, the contract must satisfy the statute of frauds. Wis.Stat. § 402.201 (1993) provides in relevant part:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by the party's authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in such writing.

. . . . .

(3) A contract which does not satisfy the requirements of sub. (1) but which is valid in other respects is enforceable:

(a) If the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

(b) If the party against whom enforcement is sought admits that party's pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this paragraph beyond the quantity of goods admitted; or

(c) With respect to goods for which payment has been made and accepted or which have been received and accepted (s. 402.606).

Wis.Stat. § 402.201. As payment has already been made, section 402.201(3)(c) would seem to allow enforcement if the crops and feed may be said to have been accepted.

■■■ The question of acceptance of goods depends on the intent and conduct of the parties which delineates acceptance as provided in Wis.Stat. § 402.606 (1993).[7] Chrys-

---

settled. In such a case the price is a reasonable price at the time of delivery if:
(a) Nothing is said as to price; or
(b) The price is left to be agreed by the parties and they fail to agree; or
(c) The price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.
(2) A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.
(3) When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one party the other may at his option treat the contract as canceled or himself fix a reasonable price.
(4) Where, however, the parties intend not to be bound unless the price is fixed or agreed and it is not fixed or agreed there is no con-

tract. In such a case the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery and the seller must return any portion of the price paid on account.

7. The section provides:
(1) Acceptance of goods occurs when the buyer:
(a) After reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their conformity; or
(b) Fails to make an effective rejection (s. 402.602(1)), but such acceptance does not occur until the buyer has had reasonable opportunity to inspect them; or
(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

*ler Corp. v. Adamatic, Inc.*, 59 Wis.2d 219, 232, 208 N.W.2d 97 (1973). "A buyer accepts goods if he notifies the seller that he accepts them, if he fails to make an effective rejection, or does an act inconsistent with the seller's ownership." *Id.* In the present case the cattle seemed satisfied. No notification was ever given for the rejection of the crops and feed, therefore no effective rejection was made. Wis.Stats. §§ 402.606; 402.602(1) (1993).[8] In the absence of rejection of the goods, the crops and feed must be deemed to have been accepted and the statute of frauds satisfied.

■■■ At the very least, the agreement was one for services where Pelton agreed to provide care for the animals. An incidental sale may take place via a service contract.[9] *See Van Sistine v. Tollard*, 95 Wis.2d 678, 685, 291 N.W.2d 636 (1980) (holding that although contract is one for services, an incidental sale took place). The statute does not distinguish between a direct sale and an incidental sale. If a sale took place, either directly or indirectly, FC's security interest continued in the proceeds.

■■■ Sections 409.306 and 402.106(1) provide the definition of a sale: "A 'sale' consists in the passing of title from seller to buyer for a price." Wis.Stat. § 402.106(1). Under Wis.Stat. § 402.401(2) (1993) title passes when the following occurs:

> Unless otherwise explicitly agreed title passes to the buyer at the time and place

at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading.

Accordingly, title passed when Pelton delivered the feed or rather when Pelton fed the collateral to the Anderson cattle. At the moment of title passing, the sale took place.

■■■ When FC's collateral was "sold", its security interest followed into the proceeds of its collateral either through § 409.-306(3)(a)[10] or § 409.306.(4)(a).[11] At the time of Pelton's filing, Pelton had only a contract right to receive payment from Anderson if and when cattle were sold. The contract right had not yet matured into an account because the amount due had not been determined.[12] Cases have held that where the collateral is still in the form of a contract right at the time of filing, section 9–306(3) was applicable and not § 9–306(4). *Matter of Heims*, 65 B.R. 112, 116 n. 4 (Bankr. N.D.Iowa 1986); *see also In re Hugo*, 58 B.R. 903, 907–08 (Bankr.E.D.Mich.1986) (UCC § 9–306(3) not § 9–306(4), determines the extent to which a creditor retains a security interest in proceeds acquired post petition). If section 409.306(3)(a) applies, then FC would still be protected as its original financing statement covered the proceeds of its collateral. If, on the other hand, section

---

**8.** Wis.Stat. 402.602(1) provides:

> (1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

**9.** In *Van Sistine*, 95 Wis.2d at 680, 291 N.W.2d 636, an agreement between a homeowner and a siding contractor used language such as "install" and "reposition." It did specifically provide for the necessary goods. *Id.* The court held that an incidental sale had taken place. *Id.* Similarly, the agreement at hand spoke of "feeding" and "caring" for the animals. The goods necessary to fulfill these obligations could be said to have been incidentally sold.

**10.** The section provides that:

> (2) Acceptance of a part of any commercial unit is acceptance of the entire unit.

> The security interest in proceeds is a continuously perfected security interest if the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after the receipt of the proceeds by the debtor unless: (a) A filed financing statement covering the original collateral also covers proceeds.

**11.** Wis.Stat. § 409.306(4)(a) provides:

> (4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest:
> (a) In identifiable noncash proceeds.

**12.** The official comment to § 409.106 provides that a "contract right is a right to be earned by future performance under an existing contract ... they become accounts as performance is made under the contract."

409.306(4)(a) is applicable, FC's security interest would still continue as the Anderson receivable at the time of filing would represent a noncash proceed.[13] Section 409.-306(4)(a) provides that a "secured party with a perfected security interest in proceeds has a perfected security interest in identifiable noncash proceeds." It is not necessary to decide which provision applies. Under either provision, FC's security interest in proceeds would continue.

The trustee argues that there was no sale. Rather, he contends that Pelton exchanged the feed for the right to participate in a joint venture with Anderson. Because I have already determined that there was a sale, it is unnecessary to consider this argument. However, if a joint venture was created, the outcome would not change.[14]

Under Wis.Stat. § 409.306(1) (1993), proceeds includes "whatever is received when collateral or proceeds is sold, exchanged, collected or otherwise disposed of." If Pelton exchanged the feed for an interest in a joint venture, FC's security interest would attach to whatever was received in exchange for its collateral.[15] *In re SMS, Inc.*, 15 B.R. 496, 499 (Bankr.D.Kan.1981). Pelton's participation in the joint venture could not have been fulfilled without exchanging the feed. The vast majority of his responsibilities consisted of feeding the Anderson cattle. Because he exchanged the collateral for the right to participate in the joint venture, FC's

security interest would attach to whatever Pelton received in return. One of the rights Pelton acquired was the right to receive payment. *Sussmann v. Gleisner*, 80 Wis.2d 435, 444, 259 N.W.2d 114 (1977). FC's security interest would attach to this right. *Matter of Guaranteed Muffler Supply*, 1 B.R. 324, 327 (Bankr.N.D.Ga.1979).

While the Anderson receivable, under either a sale or exchange may represent proceeds, in order for FC's security interest to continue it must establish that the receivable is "identifiable." *Matter of Cullen*, 71 B.R. 274, 280 (Bankr.W.D.Wis.1987). In *Matter of Cullen*, 71 B.R. at 280, proceeds which were deposited in a separate account were deemed to be identifiable. This court ruled that the "bank's security interest could certainly be traced into this separate bank account." *Id.* Similarly, the Anderson receivable has been effectively segregated from all of Pelton's other funds. The parties have already stipulated that $12,220.91 of the Anderson receivable represents feed. Thus, the proceeds from the feed can be traced into the Anderson receivable. FC has a security interest in the account to the extent of $12,-220.91. An order may be entered accordingly.

---

**13.** Under § 409.306(1), "money, checks, deposit accounts, and the like are 'cash proceeds.' All other proceeds are 'non-cash' proceeds." *Id.*

**14.** The elements necessary to establish a joint venture include the following: (1) contribution of money or services; (2) joint or mutual control; (3) an agreement to share profits although not necessarily the losses; and (4) a contract establishing the relationship. *Sussmann v. Gleisner*, 80 Wis.2d 435, 444, 259 N.W.2d 114 (1977). Both parties contributed money and services. Anderson contributed cash, while Pelton contributed his services. Both Pelton and Anderson exercised control over the venture. Pelton had control over what cattle to purchase, how to transport the cattle, what and how much to feed the cattle. Anderson had control over the cattle after Pelton, collected the purchase price and remitted payment to Pelton. Pelton shared in

both profits and losses. So long as the cattle sold for more than the purchase price, Pelton would share in the profits. The agreement did not provide for Pelton to recover all of his expenses nor any of his expenses. If the cattle were sold for a considerable amount less than the purchase price, Pelton would not recover all of his expenses. While there was no formal agreement to establish a relationship between the parties, such a relationship could be inferred from the conduct of the parties. *Employers Mut. Liability Co. of Wausau v. Parker*, 266 Wis. 179, 181, 63 N.W.2d 101 (1954). Thus, a joint venture could be found.

**15.** "Exchange" is not defined in Wis Stat § 409.-105, but cases conclude it is the giving of one thing for another. *See Bloomington Coca-cola B. Co. v. Commissioner of Int. Rev.*, 189 F.2d 14, 16 (7th Cir.1951).