In re Michael J. HUGO and Lori L. Hugo, Debtors.

Michael J. HUGO and Lori L. Hugo, Plaintiffs,

v.

UNITED STATES of America, acting By and Through the FARMERS HOME ADMINISTRATION, Defendant.

Bankruptcy No. 83–00680.
Adv. No. 85–9014.

United States Bankruptcy Court, E.D. Michigan, N.D.

March 24, 1986.

Braun, Kendrick, Finkbeiner, Schafer & Murphy by Daniel S. Opperman, Saginaw, Mich., for plaintiffs.

Michael J. Hluchaniuk, Asst. U.S. Atty., Bay City, Mich., for defendant.

MEMORANDUM OPINION REGARDING COMPLAINT TO DETERMINE VALIDITY OF LIENS AND FOR TURNOVER OF FUNDS

ARTHUR J. SPECTOR, Bankruptcy Judge.

This matter is before the Court after trial for determination of whether the Farmers Home Administration (FmHA or defendant herein) retains a perfected security interest in proceeds from the debtors' 1984 potato crop. The following constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

The facts are as follows. The plaintiffs are farmers. In order to obtain operating funds for their business, they obtained

loans from the FmHA; in return, they granted FmHA a second mortgage on their land and a security interest in their potato crop and the proceeds therefrom. When the debtors filed their petition for relief under Chapter 11 on December 27, 1983, they owed the defendant approximately $220,000. At that time, there were no crops growing on land covered by the security agreements, since those crops had already been harvested. In early 1984 the debtor received checks from the sale of their 1983 crops which were made out jointly to themselves and the FmHA. The plaintiffs wished to use this money to plant the 1984 crop. Pursuant to negotiations between the parties, on April 10, 1984, the parties established a "supervised account" wherein the proceeds, in the amount of $17,605.57, were deposited with the State Bank of Standish. As part of the agreement, the debtors were to obtain court authority to grant the defendant a security interest in the 1984 potato crop.[1] The purpose of the supervised account was to allow the debtors to use the proceeds of the 1983 potato crop to pay the expenses of operating the farm, including planting the 1984 crop, while at the same time enabling the FmHA to monitor the uses to which the debtors applied the money. The usual arrangement was that the debtors would present their bills to the FmHA along with a check made out to Mr. Hugo (the Hugos held the checkbook for the supervised account); an agent for the defendant would sign the check; the Hugos would deposit that check in their personal deposit account, maintained at the Farmers & Merchants State Bank of Hale; and they would pay their bills with checks drawn on the latter account.[2] This account was not a segregated account wherein the debtors deposited only the money received from the FmHA; instead, this was a general account into which any other income received, such as wages earned by Lori Hugo, was deposited.

Between the time the supervised account was opened in April of 1984, and the end of July, 1984, the entire balance was disbursed to the Hugos for various purposes, such as fertilizer, chemicals, seed, diesel fuel, freight costs, and authorized general living expenses. After the harvest of the 1984 potato crop the debtors received checks from purchasers made out jointly to the FmHA and the debtors. When the debtors presented these checks to the defendant, it refused to endorse them and turn over the proceeds. That refusal led to this suit.[3]

## DISCUSSION

In an earlier opinion, *In re Hugo*, 50 B.R. 963 (Bankr.E.D.Mich.1985), we held that although the defendant had failed to obtain Court approval of the agreement to grant a security agreement in the 1984 crops, this did not necessarily invalidate the defendant's lien. We noted that under Michigan law the apparently valid security interest in the debtors' 1983 crop could extend to the proceeds of the 1984 crops. Our analysis then was that since the proceeds of the 1983 crop might have been used to produce the 1984 crop, the proceeds of that crop might in fact be attributable to proceeds of the 1983 crop in which the defendant held an enforceable security interest. However, we could not tell from the record available

1. Such authority was never obtained. However, we held in an earlier opinion in this case that such failure was not fatal to the defendant's case, because even though the debtors did not obtain authority to grant a security interest in the 1984 crops, the FmHA might have retained a lien on the proceeds by virtue of its pre-petition security interest. *In re Hugo*, 50 B.R. 963, 966–67 (Bankr.E.D.Mich.1985).

2. Occasionally, the Hugos would have paid the bill first and requested and obtained reimbursement from the FmHA.

3. The debtors initially commenced this adversary proceeding against the FmHA and three purchasers of the debtors' 1984 potato crop; the complaint sought to compel the purchasers to turn over the amounts due to the plaintiffs to this Court, upon which they could be dismissed from the case. The purchasers agreed to turn over those funds to the Clerk in a stipulation dated May 31, 1985. All three have turned the proceeds over to the Clerk and they have been dismissed from this proceeding.

at that time (the case then being before us on a motion for judgment on the pleadings) whether the 1984 crop could be traced to the 1983 proceeds. *Id.* at 968. Accordingly, the matter was set for trial to determine the extent to which the proceeds of the 1983 crop were used to produce the 1984 crop and the proceeds thereof.

At trial, the parties agreed that the proceeds of the 1984 crops were grown with the proceeds of the 1983 crop and thus could be traced. However, the plaintiffs then argued that even though the proceeds were traceable, the FmHA could trace its collateral only to the extent allowed by Mich.Comp.Laws § 440.9306(4)(d)(ii); Mich. Stat.Ann. § 19.9306(4)(d)(ii)[4] because, in the course of the transformation of the 1983 crop proceeds into the 1984 crop proceeds, the collateral had been commingled with other assets of the debtors. The defendant denied that its right to trace its collateral was impaired, relying on § 9–306(4)(b). Thus, in order to resolve this dispute, we must determine the proper construction and application of § 9–306(4)(b) and § 9–306(4)(d).

Section 9–306(4)[5] sets forth the extent to which a secured creditor retains a security

interest in proceeds in the event of the debtor's insolvency. If the proceeds are identifiable non-cash proceeds, cash proceeds in separate deposit accounts, and money or checks not deposited in a deposit account prior to the insolvency proceedings subsections (a), (b), and (c) provide that the creditor's security interest survives the insolvency.[6] *In re Security Aluminum Co.,* 9 U.C.C.Rep. 47, 50 (Bankr.E.D.Mich.1971). Moreover, if the proceeds are commingled *prior* to the insolvency proceedings, it is well-established that the extent to which a creditor retains a security interest is limited to the amount allowed by § 9–306(4)(d). *See In re Martin,* 48 B.R. 317 (N.D.Tex. 1985). However, it is unclear whether the creditor's limited tracing rights under this section were intended to apply when commingling has occurred *after* insolvency.

The FmHA, understandably, argues that § 9–306(4)(d) does not control this case, positing instead that it is governed by § 9–306(4)(b). This section continues the creditor's security interest "in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to

---

**4.** Hereinafter, we will simply refer to sections in the Uniform Commercial Code by the uniform citations.

**5.** This section states as follows:

In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(a) In identifiable noncash proceeds and in separate deposit accounts containing only proceeds;

(b) In identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;

(c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and

(d) In all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is

(i) Subject to any right of setoff; and

(ii) Limited to an amount not greater than the amount of any cash proceeds received by the debtor within 10 days before the institu-

tion of the insolvency proceedings less the sum of (i) the payments to the secured party on account of cash proceeds received by the debtor during such period and (ii) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection.

In our earlier opinion we erroneously quoted the 1962 version of this statute rather than the amended version promulgated in 1972. Those amendments were adopted by the Michigan legislature by P.A.1978, No. 369, § 1, eff. January 1, 1979, and control the proceedings at bar. The parties astutely noticed the error and brought it to our attention; fortunately, it had no material effect on the earlier proceedings.

**6.** Additionally, § 552(b) of the Bankruptcy Code provides that a security interest which is entered into before the commencement of the case, and which extends to proceeds, profits, and products of the collateral, is valid and enforceable with respect to proceeds, profits and products acquired post-petition, to the extent allowed by other applicable law.

the insolvency proceedings." The defendant asserts that the term "prior to the insolvency proceedings" modifies "commingled" as well as "deposited in a deposit account", so that the provision should be interpreted to state that when money is "neither commingled *prior to the insolvency proceedings* nor deposited in a deposit account prior to the insolvency proceedings," the creditor retains its security interest. The plaintiff, on the other hand, takes the position that § 9–306(4)(b) requires that if there has been *any* commingling of proceeds, regardless of whether it occurred pre- or post-petition, then the defendant's security interest in the proceeds is measured by § 9–306(4)(d). If we adopt the defendant's interpretation, then because the proceeds were not commingled until several months *after* the commencement of this case, the FmHA's security interest would retain its vitality despite the commingling. Conversely, if we accept the plaintiffs' position, then as the debtors received no cash proceeds in the 10 days prior to the commencement of their bankruptcy case, the defendant's security interest is, on the facts of this case, extinguished.

Although there are numerous cases involving the application of § 9–306(4) when there has been commingling pre-petition, we could find only two decisions which attempted to determine the proper construction of § 9–306(4)(b) in circumstances similar to the one at bar. The first, *In re SMS, Inc.*, 15 B.R. 496, 8 B.C.D. 718, 32 U.C.C.Rep. 1631 (Bankr.D.Kan.1981) supports the defendant's view. There, the debtor operated a retail book store and had granted a security interest in inventory and proceeds to a bank. Prior to filing a petition for relief under Chapter 7, the debtor returned some inventory to a supplier in return for a credit memo. After the debtor filed for relief, the trustee sold the credit memo back to the supplier for cash, which was evidently deposited in the trustee's account. The creditor holding a security interest in the inventory and proceeds then sought to compel the trustee to abandon its collateral, including the proceeds of the credit memo. After the court held that the

credit memo constituted proceeds from the exchange of inventory, it further held that the creditor retained its security interest in the cash proceeds acquired by the trustee in exchange for the credit memo because even if the cash collateral received by the trustee were commingled, "any commingling or depositing of the cash did not occur prior to the insolvency proceeding." *Id.* 15 B.R. at 500 (Emphasis deleted).

The second decision, on the other hand, interprets § 9–306(4) favorably for the debtors. In *In re Trans-Texas Petroleum Corp.*, 33 B.R. 67, 37 U.C.C.Rep. 598 (Bankr.N.D.Tex.1983), the debtor operated a gasoline wholesaling and retailing enterprise. The debtor granted a lender a security interest in inventory, accounts receivable and proceeds. The debtor's case was commenced by an involuntary petition, converted to a case under Chapter 11, then eventually reconverted back to Chapter 7. It was during the period when the debtor operated the business under Chapter 11 that the debtor sold the bulk of its inventory, depositing the proceeds into a deposit account into which other, smaller, deposits were occasionally made. Various unsecured creditors alleged that the secured creditor had no lien on the inventory and proceeds acquired post-petition. The court, after finding that the post-petition cash proceeds were in fact commingled, held that § 9–306(4)(d) operated to limit the secured creditor's security interest to those cash proceeds received during the 10 days prior to the date the bankruptcy case was commenced. *Id.*, 33 B.R. at 69. Implicit in this holding is a parallel conclusion that "commingling", as that term is used in § 9–306(4)(b), refers to commingling at *any* time, not just prior to the commencement of the bankruptcy petition.

Despite this ruling, however, the court did not declare the creditor's lien to be extinguished; instead, it used its equitable power under 11 U.S.C. § 552(b) to declare that the creditor nonetheless held an enforceable security interest in the commingled funds. The court was troubled by the harsh result visited upon the creditor by its

analysis; it noted that because most of the inventory was converted to proceeds post-petition, and commingled with a comparatively *de minimus* amount of non-proceeds cash, the hardship imposed on the secured creditor if the security interest was rendered unperfected was much greater than that inflicted upon unsecured creditors if the security interest were enforced. Therefore, the court deemed the secured creditor's security interest in the proceeds to be continued. *Id.* at 70.

The above cases reflect what we perceive as a conflict between the result that flows from a literal reading of the statute and the outcome that would seem most consistent with the intended scope of this section. As a matter of pure statutory construction, we think that the plaintiff has the better side of the argument. The interpretation advocated by the defendant—that § 9–306(4)(b) should read "neither commingled prior to the insolvency proceedings nor deposited in a deposit account prior to the insolvency proceedings"—is somewhat strained. Moreover, that reading would require a corresponding modification, or more precisely, a limitation, of the plain language of § 9–306(4)(d). That provision establishes a 10–day rule for "all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds ...". If we read § 9–306(4)(b) as the defendant urges us to, we must also re-interpret § 9–306(4)(d) to read that a creditor's security interest in "all cash and deposit accounts of the debtor in which proceeds have been commingled with other funds *prior to the commencement of insolvency proceedings ...*". We are uncomfortable with a construction of the statute that carries such excess baggage.

■ And yet, we are reluctant to apply the statute rigidly, for that reading would

seem to apply § 9–306(4)(d) to a situation where it was not meant to apply. Like the court in *In re Trans-Texas Corp., supra*, we are troubled that the placement of cash proceeds into a general deposit account well after the commencement of insolvency proceedings would render the security interest unperfected. While the purpose of § 9–306(4)(d) was to give secured creditors a quantifiable security interest, as measured by § 9–306(4)(d)(ii), in lieu of the traditional common law tracing rights, *In re Martin, supra; In re Gibson*, 6 U.C.C. Rep. 1193 (Bankr.D.Okla.1969), we can find nothing in the Official Comments to the Uniform Commercial Code or in various other commentaries which suggests that this provision was intended to apply to post-petition commingling. We find that silence significant. Our conclusion is that § 9–306(4) governs the extent of a creditor's interest in commingled proceeds only up to and including the instant of the commencement of insolvency proceedings. Like many issues in bankruptcy law, property rights under § 9–306 are determined at the inception of the insolvency proceedings. Subsequent events in the insolvency proceeding do not affect these vested rights.

■ Having reached this conclusion, we must then decide which provision of Article 9, if any, determines the extent to which a secured creditor retains its security interest in proceeds commingled post-petition, because the Bankruptcy Code does not contain a rule on the extent to which the creditor retains a security interest in proceeds acquired post-petition. Instead, § 552(b) provides that the extent to which the security interest continues is determined by "applicable non-bankruptcy law". When there is no insolvency proceeding, § 9–306(3)[7] is the controlling statute. Al-

---

**7.** This section states as follows:

The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor unless:

(a) A filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement has been filed and, if the proceeds are acquired with cash proceeds, the description of collateral in the financing

though 9–306(3) does not seem to apply when insolvency proceedings are commenced by or against the debtor, we find that it may plausibly be applied to situations such as the one at bar. The reason is not because there is no "insolvency proceeding"; obviously, there is. Instead, § 9–306(3) can be applied because the debtor which commenced the bankruptcy proceeding is not the same entity which commingled proceeds arising from the creditor's collateral post-petition.

When an individual files a petition for relief under Chapter 11, he or she ceases to be "merely" a debtor; instead, the debtor is appointed by the court as debtor in possession. The change reflects much more than a simple change in nomenclature. Pursuant to 11 U.S.C. § 1107(a), the debtor in possession enjoys all of the rights of (and bears the responsibilities and duties of), a trustee operating the business under Chapter 11. Indeed, the "debtor-in-possession is an entity distinct from the debtor." *In re Hoffman,* 53 B.R. 564, 566 (Bankr.W. D.Ark.1985); *In re General Coffee Corp.,* 32 B.R. 23, 24 (Bankr.S.D.Fla.1983); *In re B & W Enterprises, Inc.,* 19 B.R. 421, 425, 9 B.C.D. 1, 3, 6 C.B.C.2d 615, 619 (Bankr.D. Idaho 1982), *aff'd* 713 F.2d 534 (9th Cir. 1983). Thus, when this case was commenced, the FmHA ceased doing business with the debtor as such; instead, its subsequent transactions were with the debtor in possession, *qua* trustee. *Commodity Futures Trading Commission v. Weintraub,* — U.S. ——, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *In re Multech Corp.,* 47 B.R. 747, 750, 12 B.C.D. 1221, 12 C.B.C.2d 562 (Bankr.N.D.Iowa 1985). It is from that date that we evaluate the dealings of the parties. Subsequent to that date, there has not been another insolvency proceeding; thus, as between the secured creditor and the debtor in possession § 9–306(3) may be applied.

Applying § 9–306(3), some courts have compared the debtor holding proceeds of a secured creditor's collateral to a trustee possessing the *res* of a trust. When the trustee commingles those funds with personal funds, trust law allows the beneficiary to trace those commingled funds. *See, e.g. Brown & Williamson Tobacco Corp. v. First National Bank,* 504 F.2d 998 (7th Cir.1974); *Universal C.I.T. Credit Corp. v. Farmers Bank,* 358 F.Supp. 317 (E.D.Mo.1973). These cases have allowed the secured creditor to trace funds into the debtor's commingled accounts and, applying principles derived from trust law,[8] enabled those creditors to retain a perfected security interest in those accounts.

The characterization of the debtor as a trustee of the secured creditor's collateral has been criticized as not being justified in a commercial setting, because the secured creditor has greater ability to protect itself than a trust beneficiary, and because commercial law does not ordinarily impose the same fiduciary duties upon a debtor as would be borne by an actual trustee. *See note, Right of Secured Party to Recover Proceeds Commingled in Debtor's Bank Account,* 28 Kans.L.Rev. 328, 333 (1980); *cf. In re Johnson,* 691 F.2d 249, 251 (6th Cir.1982). However, the debtor in possession in a bankruptcy case *is* a fiduciary

---

statement indicates the types of property constituting the proceeds; or

    (b) A filed financing, statement covers the original collateral and the proceeds are identifiable cash proceeds; or

    (c) The security interest in the proceeds is perfected before the expiration of the 10–day period. Except as provided in this section, a security interest in proceeds can be perfected only by the methods or under the circumstances permitted in this article for original collateral of the same type.

**8.** For example, the cited cases applied the so-called "lowest intermediate balance" rule. It may be invoked when the trustee has commingled trust funds with personal funds, made withdrawals, then later deposited personal funds. The beneficiary may claim an equitable lien upon the remaining deposits in an amount not exceeding the lowest intermediate balance in the account during this period. *Restatement (Second) of Trusts,* § 202, comment j. (1959). If the trustee has made no subsequent deposits of personal funds, the beneficiary may enforce a lien on the entire account to the extent of the trust funds placed in the account. *Id.,* comment i.

with legal duties towards creditors of the estate. The Bankruptcy Code imposes conditions upon the debtor in possession's use of secured collateral, such as the assurance of adequate protection. "The willingness of courts to leave debtors in possession 'is premised upon an assurance that [they] can be depended upon to carry out the fiduciary responsibilities of a trustee.'" *Weintraub, supra,* —— U.S. at ——, 105 S.Ct. at 1995, 85 L.Ed.2d at 383 (Citation omitted). When the debtor in possession fails to adequately carry out those responsibilities and the secured creditor's collateral is dissipated, it is fitting to hold it to the higher standards of care of the fiduciary that it is.

Thus, we hold that the extent to which the FmHA may retain a perfected security interest in the proceeds of the 1983 potato crop is controlled by § 9–306(3) rather than § 9–306(4)(d). If the proceeds of that crop may be traced to the cash proceeds of the 1984 crop at issue here, then the FmHA holds an enforceable security interest in those proceeds.

Upon review of the facts, we find that the 1984 crop proceeds are identifiable cash proceeds of the 1983 crop. In early 1984 the debtors deposited the checks from the 1983 crop into the supervised account. When those funds were withdrawn, they were deposited in the plaintiff's individual checking account. Even though those funds were commingled with other income, they were used in large part to pay the expenses incurred by the debtors to produce the 1984 crop. After harvesting and selling those crops, the debtors received payments from three purchasers. Those payments thus flow directly from the proceeds of the 1983 potato crop on which the defendant held a perfected security interest on the date the Chapter 11 case was commenced. It is undisputed that the filed financing statement covered the 1983 crops and proceeds. Pursuant to § 9–306(3)(b), the creditor retains its security interest "if the filed financing statement covered the original collateral and the proceeds are identifiable cash proceeds." We find that both conditions are satisfied.

For the foregoing reasons, we hold that the FmHA possesses a valid security interest in the 1984 potato crop proceeds in the amount of $17,605.57. Judgment will be entered in favor of the defendant to that extent on Count I of the complaint. In Count II, the plaintiffs assert that they incurred interest charges on other obligations which, but for the defendant's allegedly wrongful refusal to sign over the crop checks, they would not have incurred, and pray for damages in the amount of accrued interest. As we hold that the FmHA was justified in asserting a claim to the proceeds, judgment will be entered in favor of the defendant on Count II. Counts III, IV and V, against other parties have already been dismissed.

Upon submission, a judgment consistent with this opinion will be entered.