907 F.2d 1430
 59 USLW 2134, 23 Collier Bankr.Cas.2d 498,
20 Bankr.Ct.Dec. 1212, Bankr. L. Rep. P 73,530,
11 UCC Rep.Serv.2d 1044
 In Re BUMPER SALES, INC., Debtor.
UNSECURED CREDITORS COMMITTEE, Plaintiff-Appellant,
v.
MAREPCON FINANCIAL CORPORATION, t/a Norshipco Financial
Corporation; Bumper Sales, Inc., Defendants-Appellees.
In Re BUMPER SALES, INC., Debtor.
UNSECURED CREDITORS COMMITTEE, Plaintiff-Appellee,
v.
MAREPCON FINANCIAL CORPORATION, t/a Norshipco Financial
Corporation, Defendant-Appellant,
and
Bumper Sales, Inc., Defendant.
 Nos. 89-3312, 89-3317.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 9, 1990.
Decided July 3, 1990.
As Amended in No. 89-3312 July 26, 1990.
 
 Joseph Ray Mayes, argued (Jacqueline A. Hoskins, Wolcott, Rivers, Wheary, Basnight & Kelly, P.C., Virginia Beach, Va., on brief), for plaintiff-appellant.
 Anthony Franklin Radd, argued, (Ronald M. Gates, Payne, Gates, Farthing & Radd, P.C., Norfolk, Va., on brief), for defendants-appellees.
 Before ERVIN, Chief Judge, and HALL and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal stems from the district court's affirmance of the bankruptcy court's order granting to the appellee/cross-appellant Marepcon Financial Corporation (Marepcon), t/a Norshipco Financial Corporation (Norshipco), a post-petition security interest in the inventory, receivables and other assets of debtor Bumper Sales, Inc. (Bumper Sales), to the detriment of appellant/cross-appellee Unsecured Creditors' Committee (the Committee). We affirm.
 
 
 2
 * In order to expand its inventory of car and truck bumpers, Bumper Sales borrowed from Marepcon, a small asset-based lender whose trade name is Norshipco, about $510,000 in the form of two promissory notes, one for $110,000 dated December 8, 1987, and another for $400,000 dated March 9, 1988. In return, Bumper Sales agreed to give Marepcon a security interest in "all of ... [Bumper Sales'] inventory, accounts receivable, contract rights, furniture, fixtures and equipment, general intangibles, now owned or hereafter-acquired and the proceeds from said collateral," as stipulated by the parties.
 
 
 3
 To perfect its security interest, Marepcon filed three financing statements in the Circuit Court of the City of Norfolk and with the State Corporation Commission. The first was filed in April 1987, and showed Marepcon as secured party against all of Bumper Sales' "inventory or the proceeds thereof now owned or hereafter-acquired." The second was filed in November 1987, and showed Norshipco as secured party against "[a]ll accounts receivable, inventory and general intangibles and the proceeds thereof now owned or hereafter-acquired." The third was filed in December 1987, and showed Norshipco as secured party against "[a]ll accounts receivable, inventory, general intangible, furniture, fixtures and equipment now owned and hereafter-acquired." A fictitious name certificate indicating that Norshipco is a trade name for Marepcon was filed in the Circuit Court of Norfolk and with the State Corporation Commission in July, 1987.
 
 
 4
 When Bumper Sales filed for Chapter 11 bankruptcy on July 22, 1988, the principal remaining due to Marepcon was $499,964.88. At that time, the value of Bumper Sales' inventory, which consisted solely of finished bumpers, was $769,000. Bumper Sales continued to operate the business as debtor-in-possession. On August 12, 1988, Bumper Sales' counsel, Jonathan L. Hauser, wrote to Ronald M. Gates of Marepcon, stating that he
 
 
 5
 assumed that our [Bumper Sales'] previous understanding with Mr. Waters [the former Executive Vice President of Marepcon] remains, i.e., that [Bumper Sales] may continue to use the cash collateral subject to the security interest of Norshipco Financial Corporation [Marepcon] in the ordinary course of business, so long as it continues to keep ... [Marepcon's] loan current and complies with all of the other usual covenants contained in the loan documents.[1]
 
 
 6
 In other words, Marepcon consented to Bumper Sales' use of the cash proceeds of pre-petition inventory and accounts to finance post-petition inventory. No order conditioning such use of cash collateral on the grant of a post-petition lien in the collateral was entered.
 
 
 7
 However, on August 19, 1988, Bumper Sales' owner and president, Joel B. Campbell, and Bumper Sales' counsel, Mr. Hauser, met with Joseph R. Mayes, counsel for the Committee, and had the following exchange:
 
 
 8
 Mr. Mayes: Q. What arrangements have been made with Norshipco [Marepcon] for the use of cash collateral?Debtor (Mr. Campbell): A. We've provided them with security.
 
 
 9
 Mr. Mayes: Q. Is this cash collateral arrangement in effect or about to come into effect?
 
 
 10
 Mr. Hauser: A. Yeah. I've discussed it with counsel and basically so long as the terms and so long as we provide them with certain information, they'll be reasonably happy.
 
 
 11
 Mr. Mayes: Q. Will there be a post petition lien in effect?
 
 
 12
 Mr. Hauser: A. Yes. Most assuredly.
 
 
 13
 The parties stipulated that, during the post-petition period, Bumper Sales did not borrow any outside funds or incur any outside debt; that Bumper Sales used only Marepcon's cash collateral--the cash proceeds of inventory secured under Marepcon's security interest--to finance new inventory; and that Bumper Sales would not have been able to reorganize without the use of the cash collateral.
 
 
 14
 On March 31, 1989, Marepcon filed a Motion to Condition Use, Sale or Lease of Collateral and Proceeds, declaring a claim of $500,000 against Bumper Sales and asserting a security interest in Bumper Sales' inventory, accounts receivable, general intangibles, furniture, fixtures, equipment, and proceeds. The motion sought adequate protection for this security interest.[2] The Committee filed an objection to the motion challenging the proper perfection of Marepcon's security interest and contending that any post-petition lien had been lost by Marepcon's failure to condition use of the collateral. The bankruptcy court held that Marepcon had a valid and properly perfected security interest in Bumper Sales' pre-petition inventory and receivables, among other assets, and their proceeds, and that this security interest continued post-petition to the extent of Marepcon's unpaid claim. As a result, the court granted Marepcon a lien on Bumper Sales' pre- and post-petition collateral. The U.S. District Court for the Eastern District of Virginia affirmed the bankruptcy court, and the Committee appeals.
 
 II
 
 15
 We address first Marepcon's contention (in its cross-appeal) that the Committee lacks standing to contest Marepcon's motion to condition use of the cash collateral. Section 1109(b) of the Bankruptcy Code states that
 
 
 16
 [a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.
 
 
 17
 11 U.S.C. Sec. 1109(b) (1988) (emphasis added). It has been said that Section 1109(b) "is to be construed broadly, in order to allow parties affected by a chapter 11 case to appear and be heard." In re Public Service Co. of New Hampshire, 88 B.R. 546, 550 (Bankr.D.N.H.1988). See also 5 Collier on Bankruptcy, p 1109.02 at 1109-25 (15th Ed.1989).
 
 
 18
 The Committee is clearly a "party in interest" under the express language of Section 1109(b). Unfortunately, the Code does not explain the difference between a "case," in which the Committee plainly may intervene, and an "adversary proceeding," in which the Committee has a debatable right to intervene.[3] However, it is apparent that this dispute is a case, not an adversary proceeding. First, the purpose of this motion--to condition the use of cash collateral--is not cited in the list of adversary proceedings set forth in Rule 7001 of the Bankruptcy Rules.[4] While it is arguable that this is a proceeding "to determine the validity, priority or extent of a lien or other interest in property," that was not the original purpose of the motion. Moreover, the motion's focus on this issue does not justify turning the motion into an adversary proceeding, given Congress's intent under Section 363 to allow the court to handle such issues expeditiously so as to minimize any delay that may harm a debtor-in-possession or trustee who needs the use of cash collateral to continue operations. Finally, Bankruptcy Rule 4001(d) allows the court to approve a motion for approval of an agreement for the use of cash collateral, even though a creditors' committee's objection may raise issues pertaining to the extent of a lien or interest in property. It would be inconsistent with this rule to require an adversary proceeding in this case, which invokes the same kind of issues.
 
 
 19
 Second, Marepcon initiated this dispute by filing a motion on March 31, 1989, pursuant to Section 363(e) of the Bankruptcy Code. However, Rule 7003 of the Bankruptcy Rules requires that an adversary proceeding be commenced with the filing of a complaint.[5] This indicates that the parties and the court did not consider this to be an adversary proceeding. Marepcon cannot argue now that it is one in order to thwart the Committee's right to intervene in the case. Third, the express language of Section 363(e) states that a hearing is optional, whereas an adversary proceeding by definition involves a hearing; thus, the mere possibility of the lack of a hearing under a Section 363(e) motion seems to preclude its characterization as an adversary proceeding. Therefore, we find that this is a "case" under Section 1109(b) and hold that the Committee has standing to be heard. See 3 Collier Bankruptcy Practice Guide, p 41.04 at 41-11 (1990) ("The cumbersome adversary proceeding mechanism is not required under section 363.").
 
 III
 
 20
 We now turn to the issues raised by the Committee on its appeal. The Committee first argues that Marepcon's financing statements are seriously misleading because, while the April 1987 financing statement is in the name of Marepcon, the November and December 1987 financing statements are in the name of Norshipco, which is a trade name of Marepcon. We disagree.
 
 
 21
 In analyzing this claim, we look first to Section 9-402(1) of the Uniform Commercial Code (UCC), which states that a "financing statement is sufficient if it gives the names of the debtor and the secured party," among other things. Va.Code Ann. Sec. 8.9-402(1) (Supp.1989) (emphasis added). Section 9-402(8) qualifies this requirement, providing that "[a] financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading " (emphasis added). The issue is "whether or not 'a reasonably diligent searcher' would be misled by the irregularity." In re Bosson, 32 F.Supp. 1013, 1017 (D.Conn.1977) (quoting J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code 839 (1972)). This is determined on a case by case basis. The rationale for this minimal threshold is that the financing statement is designed to "indicate[ ] merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." Official Comment # 2, Va.Code Sec. 8.9-402. See also In re Varney Wood Prods., Inc., 458 F.2d 435 (4th Cir.1972); Hixon v. Credit Alliance Corp., 235 Va. 466, 369 S.E.2d 169 (1988).
 
 
 22
 Some courts have found that the use of the debtor's trade name on the financing statement is "seriously misleading" and not "minor error." See, e.g., Pearson v. Salina Coffee House, Inc., 831 F.2d 1531 (10th Cir.1987); In re Thomas, 466 F.2d 51 (9th Cir.1972); and Greg Restaurant Equipment & Supplies, Inc. v. Valway, 144 Vt. 59, 472 A.2d 1241 (1984). However, others have upheld the use of a debtor's trade name. See, e.g., In re Glasco, Inc., 642 F.2d 793 (5th Cir.1981). The courts' concern is understandable, because a prospective creditor checking to see if a financing statement has been filed may look only under the debtor's real name, not the debtor's trade name, and thereby miss the filing altogether. However, the use of the secured party's (as opposed to the debtor's) trade name is much less troubling, in part because the financing statement still gives notice that the debtor's assets may be encumbered and that further inquiry is warranted. See, e.g., In re Brown, 68 B.R. 670 (D.Colo.1986). See also Clark, The Law of Secured Transactions under the Uniform Commercial Code, p 2.9 at 2-56 (1988 Cum.Supp.). Consistent with this thinking, the UCC does not require the secured party to refile a financing statement upon any post-filing changes in the secured party's name or identity, whereas it does impose a responsibility in certain circumstances to refile when the debtor's name changes. Va.Code Sec. 8.9-402(7).
 
 
 23
 In the instant case, we believe that Marepcon's use of its trade name, Norshipco, is not seriously misleading. Any prospective creditor of Bumper Sales easily would have discerned from the filed financing statements that Marepcon and Norshipco were, in fact, the same entity, given that such a creditor would have seen that the financing statements showing Norshipco as the secured party gave the identical address as the financing statements showing Marepcon as the secured party. In addition, Marepcon filed with the State Corporation Commission a fictitious name certificate showing that Marepcon was conducting business under the trade name, Norshipco, giving further notice to any prospective creditor. In light of these facts, the Committee fails to explain in what manner the financing statements are misleading. Therefore, we find that a "reasonably diligent searcher" would not have been misled by Marepcon's use of its trade name.[6]
 
 IV
 
 24
 We now address the crux of the Committee's appeal: whether Marepcon has a security interest in Bumper Sales' post-petition assets. This issue is partly answered easily, because the Committee does not contest that Marepcon holds a security interest in the pre-petition collateral (i.e., that held as of the bankruptcy filing on July 22, 1988) remaining in Bumper Sales' hands at the time of Marepcon's motion for adequate protection on March 31, 1989. It was stipulated that the total amount of inventory at the time of the filing was $769,000. Mr. Waters, the former Executive Vice President of Marepcon, testified that the total cost of goods sold, and hence total amount of inventory released, during this period was at most $464,000 and at least $168,000, making the inventory remaining at the time of the motion between $305,000 ($769,000-$464,000) and $601,000 ($769,000-168,000). Adding the undisputed value of pre-petition equipment of $74,000 and pre-petition receivables of $11,215.57, Marepcon's security interest extends to at least $390,215.57 ($305,000 + $74,000 + $11,215.57) of Bumper Sales' post-petition assets. Given that Marepcon's total claim against Bumper Sales amounts to $486,957.69, the remainder of this opinion is devoted to the issue whether the $96,742.12 balance is secured.
 
 
 25
 The Committee maintains that Marepcon's security interest does not cover Bumper Sales' post-petition inventory and accounts,[7] because Section 552(a) of the Bankruptcy Code invalidates the operation of after-acquired clauses in bankruptcy. Section 552(a) states as follows:
 
 
 26
 Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
 
 
 27
 11 U.S.C. Sec. 552(a) (1988). This subsection was "designed to facilitate the debtor's 'fresh start' by allowing the debtor to acquire postpetition assets free of prepetition liabilities" and thereby offer "postpetition accounts receivable and inventory as collateral" to new creditors. In re Photo Promotion Associates, Inc., 53 B.R. 759, 763 (Bankr.S.D.N.Y.1985).
 
 
 28
 In response, Marepcon asserts that Section 552(b), which carves out an exception to Section 552(a), applies:
 
 
 29
 (b) Except as provided in section[ ] 363 ... of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds ... of such property, then such security interest extends to such proceeds ... acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.
 
 
 30
 11 U.S.C. Sec. 552(b) (1988). Marepcon correctly explains that, according to Section 552, "[p]roceeds coverage, but not after-acquired property clauses, are valid under title 11." In re Gross-Feibel Co., Inc., 21 B.R. 648, 649 (Bankr.S.D.Ohio 1982) (quoting 124 Cong.Rec. H11, 097-98 (Sept. 28, 1978) (remarks of Rep. Edwards); S17,414 (Oct. 6, 1978) (remarks of Sen. DeConcini)). Marepcon contends that its security interest extends to Bumper Sales' post-petition inventory and accounts because they are proceeds of Bumper Sales' pre-petition inventory and accounts, pointing out that Bumper Sales' post-petition inventory was financed solely by the proceeds of its pre-petition inventory and accounts.[8]
 
 
 31
 The issue before us, then, is whether Bumper Sales' post-petition inventory and accounts are after-acquired property or proceeds. In order to determine the applicability of the exception in Section 552(b), we must undertake a four-part inquiry. First, is there a pre-petition security agreement that by its terms extends to Bumper Sales' pre-petition inventory, accounts and proceeds? Second, did Bumper Sales receive the proceeds of the pre-petition inventory and accounts after the filing of the petition? Third, is Bumper Sales' post-petition inventory second generation proceeds of pre-petition inventory and accounts, and are Bumper Sales' post-petition accounts proceeds of post-petition inventory? Fourth, did Marepcon's consent to Bumper Sales' use of the proceeds of pre-petition inventory and accounts to purchase post-petition inventory destroy Marepcon's security interest?
 
 
 32
 Under the first inquiry, it is clear that Marepcon has a security interest that was created before Bumper Sales filed its petition for bankruptcy and that covers inventory, accounts and proceeds. Under the second inquiry, the parties do not deny that Bumper Sales received the proceeds of pre-petition inventory after the filing of the petition. Thus, the basic factual prerequisites of Section 552(b) are met.
 
 
 33
 Under the third inquiry, we encounter difficulties in construing the Bankruptcy Code, because Section 552(b) fails to establish the parameters of "proceeds." Two interpretations are possible. One infers from the absence of a Code definition and from Section 552(b)'s language limiting any security interest "to the extent provided by ... applicable nonbankruptcy law" that Congress intended to defer to state law, i.e., to the UCC. See 4 Collier on Bankruptcy p 552.02 at 552-11 (8th Ed.1989). The other interpretation relies primarily on the legislative history stating that "[t]he term 'proceeds' is not limited to the technical definition of that term in the UCC, but covers any property into which property subject to the security interest is converted." H.R.Rep. No. 95-595, 95th Cong., 1st Sess 377 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6333. This view encourages a broader coverage of proceeds than in the UCC. See, e.g., 2 Norton Bankr.L. and Prac. Sec. 38.03 at 38-2 (1981) (proceeds includes "property into which the prepetition property is converted, property derived from the prepetition property, and income from the prepetition property that is acquired by the estate after the commencement of the case."). However, we believe that Section 552(b)'s express reference to "nonbankruptcy law" should take priority over a vague and isolated piece of legislative history. We also note that the judicial creation of a definition for "proceeds," broader post-petition than pre-petition, would produce arbitrary and potentially inequitable results. As a result, we hold that the UCC's definition and treatment of proceeds applies to Section 552 of the Bankruptcy Code. This is consistent with the unstated rule of the many courts that have looked to the UCC in applying Section 552 of the Code. See, e.g., Smith v. Dairymen, Inc., 790 F.2d 1107 (4th Cir.1986); In re Hugo, 58 B.R. 903 (Bankr.E.D.Mich.1986); In re Transp. Design and Technology, Inc., 48 B.R. 635 (Bankr.S.D.Cal.1985).
 
 
 34
 Turning to the UCC, we start with Section 9-306(2), which states that a security interest in collateral continues in any proceeds of such collateral: "Except where this title otherwise provides, a security interest ... continues in any identifiable proceeds including collections received by the debtor." Va.Code Ann. Sec. 8.9-306(2) (1950). Section 9-306(1) explains what is included: " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds.... Money, checks, deposit accounts, and the like are 'cash proceeds.' " Va.Code Ann. Sec. 8.9-306(1) (Supp.1989). Thus, the funds received by Bumper Sales from the sale of its inventory and collection of accounts are cash proceeds, and Marepcon's security interest in Bumper Sales' pre-petition inventory and accounts continues in the cash proceeds, so long as they are identifiable. But there is no doubt that the cash proceeds are identifiable, because the parties have stipulated that Bumper Sales used only these cash proceeds to finance its operations during bankruptcy. Since only these proceeds were used, they are conclusively identifiable.
 
 
 35
 However, Sections 9-306(3) and (4), expanding on Section 9-306(2)'s requirement that the proceeds be identifiable, place limits on a secured party's rights in proceeds. The Committee argues that Section 9-306(4)[9] applies to this case, asserting that the proceeds of Bumper Sales' inventory were commingled with other funds in Bumper Sales' debtor-in-possession account and that Marepcon's failure to provide evidence indicating the amount of proceeds received by Bumper Sales within twenty days of the filing destroys its security interest in the proceeds. But the Committee overlooks the ample and well-reasoned precedent holding that Section 9-306(4) "governs the extent of a creditor's interest in commingled proceeds only up to and including the instant of commencement of the insolvency proceedings." In re Hugo, 58 B.R. 903, 907 (Bankr.E.D.Mich.1986). As a result, Section 9-306(4) "specifically deals with the cases in which funds are commingled prior to filing bankruptcy ... [and not to] cases in which funds are commingled after filing." In re Turner, 13 B.R. 15, 22 n. 1 (Bankr.D.Neb.1981). Since any proceeds claimed under Section 552(b) are received after the filing, Section 9-306(4) is per se inapplicable. See also In re Heims, 65 B.R. 112, 116 n. 4 (Bankr.N.D.Iowa 1986); In re SMS, Inc., 15 B.R. 496, 500 (Bankr.D.Kansas 1981). Moreover, to hold that Section 9-306(4) is applicable "would have a chaotic effect upon existing liens on property of the type customarily taken by lenders to operating businesses," because any proceeds of pre-petition collateral received after the filing would not be covered by a pre-petition security agreement. In re Aerosmith Denton Corp., 36 B.R. 116, 118 (Bankr.N.D.Tex.1983). Thus, we decline to apply Section 9-306(4).
 
 
 36
 Consequently, we believe that Section 9-306(3)[10] is the proper approach to analyzing whether a security agreement extends to post-petition proceeds of pre-petition collateral. We feel that this section avoids an overly technical definition of proceeds (such as in Section 9-306(4)) that the legislative history expressly rejects. Moreover, the use of this section ensures that a creditor's security interest in proceeds receives the same treatment both before and after a filing for bankruptcy. Finally, this section will not thwart the "fresh start" ambitions of the Code, because the debtor-in-possession will still be able to encumber assets that are not proceeds of pre-petition collateral.[11]
 
 
 37
 Under Section 9-306(3)(b), a security interest in proceeds remains perfected twenty days after receipt by the debtor if "a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds." In this case, we have already shown that Marepcon has a security interest in the pre-petition inventory and accounts and that the cash proceeds of such inventory and accounts are identifiable. As a result, Marepcon has a security interest in the cash proceeds. However, Bumper Sales subsequently used the cash proceeds to finance new inventory, which was both after-acquired property and proceeds. This presents an apparent conflict between Section 552(a), which cuts off after-acquired property clauses, and Section 552(b), which continues security interests in proceeds. Professor Clark describes this collision and offers a solution:
 
 
 38
 What happens when the proceeds or final products are sold by the estate and the cash is used to manufacture new inventory, particularly in a rehabilitation proceeding? A literal reading of Sec. 552 would suggest that the general rule applies and the floating lien is cut off. In other words, a bright line is drawn between first-generation proceeds and after-acquired property. Such a result, however, could completely deprive the secured party of his pre-petition perfected security interest. Therefore, the term "proceeds" should be read broadly--as in U.C.C. Sec. 9-306--to include after-acquired property, at least where inventory and accounts are concerned and there is no improvement in position. This is nothing more than a post-petition substitution of collateral.
 
 
 39
 Clark, The Law of Secured Transactions under the Uniform Commercial Code, p 6.6 at 6-47 (1980).
 
 
 40
 We agree that Section 552(b) covers second generation proceeds, even if they are in the form of inventory, because such proceeds are clearly contemplated by the UCC. Section 9-306(1) states that proceeds includes the proceeds of proceeds: " 'Proceeds' includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." Va.Code Sec. 8.9-306(1) (Supp.1989) (emphasis added). As a result, "after-acquired property will frequently qualify as second-generation proceeds, as when a dealer sells an appliance and reinvests the cash proceeds in new inventory." Clark, The Law of Secured Transactions under the Uniform Commercial Code, p 10.1 at 10-4 (1980). The fact that Section 552(a) denies the validity of after-acquired property clauses in bankruptcy does not affect this reasoning. Accordingly, the courts have held that, when a secured party has a pre-petition security interest in a crop in Year 1, its security interest extends to the post-petition proceeds of that crop as well as to the post-petition crop in Year 2 and its proceeds if the Year 2 crop is financed with the proceeds of the Year 1 crop. In re Heims, 65 B.R. 112 (Bankr.N.D.Iowa 1986); In re Hugo, 58 B.R. 903 (Bankr.E.D.Mich.1986). See also J. Catton Farms v. First Nat'l Bank of Chicago, 779 F.2d 1242, 1247 (7th Cir.1985). The only requirement is that the second generation proceeds be traceable to the original collateral, which, as discussed above, the parties have stipulated is true in this case. Therefore, we hold that Marepcon has a properly perfected security interest in Bumper Sales' post-petition inventory as well as in any post-petition accounts and cash generated therefrom.[12]
 
 
 41
 Under the fourth inquiry, the Committee argues that Marepcon's consent to Bumper Sales' use of the proceeds to purchase inventory destroyed Marepcon's security interest in the proceeds. In particular, the Committee claims that Marepcon's consent precludes its right to trace proceeds under Section 9-306(2) of the UCC. In effect, the Committee argues that Marepcon's failure to condition its consent on the grant of a post-petition lien on Bumper Sales' inventory under Section 363 precludes its security interest in the post-petition inventory and the proceeds thereof. We disagree.
 
 Section 9-306(2) states that
 
 42
 a security interest continues in collateral notwithstanding the sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
 
 
 43
 Va.Code Ann. Sec. 8.9-306(2) (Supp.1989) (emphasis added). Therefore, under Section 9-306(2), a secured party's authorization may nullify its security interest in the collateral, so long as "there is a clear manifestation of the secured party's intent that the collateral be transferred free and clear of its security interest." In re Southern Properties, Inc., 44 B.R. 838, 843 (Bankr.E.D.Va.1984) (interpreting the Virginia version of UCC); In re Brubaker, 57 B.R. 736, 740 (Bankr.W.D.Va.1986) (interpreting the Virginia version of UCC).
 
 
 44
 However, the authorized disposition of the collateral has no effect on the secured party's security interest in the proceeds of the disposition: "The secured party remains protected because the Code provides that its security interest will continue in the proceeds of the sale of the collateral." In re Southern Properties, 44 B.R. at 842-43 (emphasis in original). See also In re Cullen, 71 B.R. 274, 279 (Bankr.W.D.Wis.1987) ("[A] security interest in proceeds continues in accordance with the express language of U.C.C. Sec. 9-306(2) regardless of a secured party's consent to sale of the collateral."); In re Mid State Wood Prods. Co., 323 F.Supp. 853, 857 (N.D.Ill.1971) ("Section 9-306(2) of the Code expressly reserves the right to proceeds notwithstanding authorization to sell the primary collateral. Whether the sale was authorized ... in no manner affects [the secured party's] interest in the retained proceeds."). In this case, Marepcon is claiming only an interest in the proceeds of the use of the cash collateral, i.e., the post-petition inventory and its proceeds, not the cash collateral itself. Thus, Section 9-306(2) preserves Marepcon's security interest in the post-petition inventory, regardless of Marepcon's consent to Bumper Sales' use of the cash collateral.[13]
 
 
 45
 The Committee's argument under Section 363 is premised on the fact that Section 552(b) is expressly subject to the provisions of Section 363 of the Code. This section deals in part with the use of cash collateral, which includes the proceeds of property subject to a pre-petition security interest;[14] under this definition, the cash proceeds of Bumper Sales' pre-petition inventory and accounts secured by Marepcon are cash collateral. In particular, the Committee claims that Marepcon consented to the use of its cash collateral pursuant to section 363(c)(2), which states that a debtor may not use cash collateral without the secured party's consent.[15] The Committee insists that Marepcon's failure to seek a court order conditioning the use of cash collateral under Section 363(e)[16] is fatal to its claim.
 
 
 46
 However, we see nothing in Section 363 that alters the rule established under Section 9-306 of the UCC by requiring a secured party to obtain a court order to preserve rights in the proceeds of cash collateral. Indeed, Section 363 deals with the antecedent issue whether the debtor may even use the cash collateral in the first place, an important determination because the use of cash collateral "may involve a complete consumption of the [secured party's] collateral." 3 Collier Bankruptcy Practice Guide, p 41.04 at 41-13 (1990). However, Section 363 does not concern the issue whether the debtor's use affects the secured party's interest in the proceeds of the cash collateral. The latter issue depends on the application of Section 9-306. As a result, Marepcon's consent to Bumper Sales' use of the cash collateral under Section 363(c)(2) does not affect Marepcon's security interest in the proceeds of the cash collateral. Of course, Marepcon could have prevented the litigation of this issue by seeking a court order under Section 363(e), but Marepcon did not lose its security interest by failing to do so.[17]
 
 V
 
 47
 For the above reasons, the holding of the district court is
 
 
 48
 AFFIRMED.
 
 
 
 [1]
 The record does not give any direct evidence of this "previous understanding."
 
 
 [2]
 Marepcon moved pursuant to Section 363(e) of the Bankruptcy Code, which states that
 [n]otwithstanding any other provision of ... [Section 363], at any time, on request of an entity that has an interest in property used ... or proposed to be used ... by the trustee, the court, with or without a hearing, shall prohibit or condition such use ... as is necessary to provide adequate protection of such interest.
 11 U.S.C. Sec. 363(e) (1988).
 
 
 [3]
 Compare In re Marin Motor Oil, Inc., 689 F.2d 445, 449-51 (3d Cir.1982), cert. denied sub nom. Michaels v. Official Unsecured Creditors' Committee, 459 U.S. 1206, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983) (where the court held that a creditor's committee has a right to intervene in any adversary proceeding), with Fuel Oil Supply and Terminaling v. Gulf Oil Corp., 762 F.2d 1283, 1287 (5th Cir.1985) (where the court allowed a creditors' committee to intervene only pursuant to Rules 24(a)(2) and 24(b) of the Federal Rules of Civil Procedure)
 
 
 [4]
 Rule 7001 states that an adversary proceeding is a proceeding
 (1) to recover money or property ...,
 (2) to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d),
 (3) to obtain approval pursuant to Sec. 363(h) for the sale of both the interest of the estate and of a coowner in property,
 (4) to object to or revoke a discharge,
 (5) to revoke an order of confirmation of a chapter 11 or chapter 13 plan,
 (6) to determine the dischargeability of a debt,
 (7) to obtain an injunction or other equitable relief,
 (8) to subordinate any allowed claim or interest, except when subordination is provided in a chapter 9, 11, or 13 plan,
 (9) to obtain a declaratory judgment relating to any of the foregoing, or
 (10) to determine a claim or cause of action removed pursuant to 28 U.S.C. Sec. 1452.
 Bankruptcy Rule 7001 (1988).
 
 
 [5]
 Rule 7003 states that "Rule 3 F.R.Civ.P. applies in adversary proceedings." In turn, Rule 3 of the Federal Rules of Civil Procedure provides: "A civil action is commenced by filing a complaint with the court."
 
 
 [6]
 Of course, we do not hold that the use of the secured party's trade name is always sufficient, but only that the facts surrounding this case indicate that Marepcon's use of its trade name on some of its financing statements covering Bumper Sales' assets was not seriously misleading. However, secured parties should use their legal names rather than trade names in order to prevent any possible confusion and subsequent litigation
 
 
 [7]
 Because the Committee does not discuss the court's holding that Marepcon has a security interest in Bumper Sales' post-petition assets other than inventory and accounts, we do not address the matter
 
 
 [8]
 While the Committee challenges Marepcon's security interest in post-petition accounts arising from post-petition inventory, the Committee concedes that Marepcon has a security interest in any accounts and cash arising from pre-petition inventory. Nothing in the record enables us to distinguish these two forms of post-petition accounts
 
 
 [9]
 This section reads as follows:
 In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:
 (a) in identifiable noncash proceeds and in separate deposit accounts containing only proceeds;
 (b) in identifiable cash proceeds in the form of money which is neither commingled with other money nor deposited in a deposit account prior to the insolvency proceedings;
 (c) in identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings; and
 (d) in all cash and deposit accounts of the debtor, in which proceeds have been commingled with other funds, but the perfected security interest under this paragraph (d) is
 (i) subject to any right of setoff; and
 (ii) limited to an amount not greater than the amount of any cash proceeds received by the debtor within twenty days before the institution of the insolvency proceedings less the sum of (I) the payments to the secured party on account of cash proceeds received by the debtor during such period and (II) the cash proceeds received by the debtor during such period to which the secured party is entitled under paragraphs (a) through (c) of this subsection (4).
 Va.Code Ann. Sec. 8.9-306(4) (Supp.1989).
 
 
 [10]
 This section states:
 The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected twenty days after receipt of the proceeds by the debtor unless
 (a) a filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement has been filed and, if the proceeds are acquired with cash proceeds, the description of collateral in the financing statement indicates the types of property constituting the proceeds; or
 (b) a filed financing statement covers the original collateral and the proceeds are identifiable cash proceeds; or
 (c) the security interest in the proceeds is perfected before the expiration of the twenty-day period. Except as provided in this section, a security interest in proceeds can be perfected only by the methods or under the circumstances permitted in this title for original collateral of the same type.
 Va.Code Sec. 8.9-306(3).
 
 
 [11]
 This holding accords with In re Hugo, 58 B.R. 903, 908 (Bankr.E.D.Mich.1986), where the court applied Section 9-306(3), even though it "does not seem to apply when insolvency proceedings are commenced by or against the debtor." The court reasoned that "because the debtor which commenced the bankruptcy proceeding is not the same entity which commingled proceeds arising from the creditor's collateral post-petition," there is no insolvency proceeding against the debtor-in-possession that would preclude the application of Section 9-306(3). See Clark, The Law of Secured Transactions under the Uniform Commercial Code, p 6.6 at S6-26 to 28 (1988 Cum.Supp. No. 1) (concluding that the "Hugo case seems well reasoned.")
 
 
 [12]
 Our holding is further supported by the fact that Marepcon's security interest in post-petition inventory does not prejudice the Committee in any way, again because the post-petition inventory was produced entirely with the proceeds of Marepcon's pre-petition collateral, not with any of the debtor's unencumbered assets to which the Committee, as unsecured creditors, might have had a claim in bankruptcy
 
 
 [13]
 For this reason, we disagree with In re Lovelady, 21 B.R. 182 (Bankr.D.Or.1982), where the court held that the secured party's consent to the use of cash collateral causes the secured party to lose his right to trace proceeds under Section 9-306(2). This court failed to distinguish between rights in the collateral, which are lost if consent is given, and rights in the proceeds, which are retained regardless of consent
 
 
 [14]
 Section 363(a) states that cash collateral
 means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds ... of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.
 11 U.S.C. Sec. 363(a).
 
 
 [15]
 Section 363(c)(2) states that:
 The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--
 (A) each entity that has an interest in such cash collateral consents; or
 (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.
 11 U.S.C. Sec. 363(c)(2).
 
 
 [16]
 This section provides that:
 Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.
 11 U.S.C. Sec. 363(e).
 
 
 [17]
 A case cited by the Committee, In re Cross Baking Co., 818 F.2d 1027 (1st Cir.1987), actually supports our holding, because the court there proceeded on the assumption that the secured party's security interest in receivables extends to post-petition receivables if the latter are traceable from the former, regardless of whether the use of cash collateral is conditioned by court order. See Survey: Uniform Commercial Code--Secured Transactions, 43 Bus.Law. 1425, 1453 (1988) ("[W]hile an after-acquired property clause is often unassailable outside bankruptcy, section 552 of the Bankruptcy Code will, as a practical matter, terminate its effectiveness unless the secured creditor can trace the collateral or obtains an appropriate cash collateral order from the court.") (emphasis added)